# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION ) | Master File No. C07-1827 SI |
| | MDL No. 1827 |
| This Document Relates to: | |
| Motorola Mobility, Inc. | |
| Plaintiff, | |
| vs. | |
| AU OPTRONICS CORPORATION et al., | |
| Defendants | |

**EXPERT REPORT OF PROFESSOR DENNIS W. CARLTON**

**February 23, 2012**

earlier) through 2006. As such, they largely fail to acknowledge that the effect, if any, of alleged conspiratorial conduct, would be expected to differ depending on the intensity of the conspiratorial activity.

80. In particular, Dr. Bernheim identifies a single "Conspiracy Period" as August 1998 through December 2006 and a single "Plea Period" as September 2001 through December 2006.[60] His analysis of prices within these periods focuses on two extremely broad price indices—one for all panels 10" (diagonal) or larger and one for all panels smaller than 10". He concludes that these two indices were elevated for the 1998-2006 period with effectively no recognition of all the heterogeneity in evidence for communications or other alleged cartel activities across panels. Similarly, Dr. Bernheim claims that STN panel prices were also elevated, despite not including them in his analysis.[61]

81. The heterogeneity in the nature of communications by type of panels is established clearly by the documentary record. Most basically, the multilateral Crystal Meetings focused primarily on just one of the three broad categories of panels—monitor and notebook panels—with more limited evidence of discussion of television panels (later in the alleged cartel period) and no evidence of discussion of small/mobile panel prices. These differences among categories of panels as to whether their prices were discussed at the multilateral Crystal Meetings is important. As a matter of economics, in an industry with many firms making many different products, a cartel based on separate bilateral communications is less likely to succeed in raising price significantly than one based on organized multilateral meetings.

---

60 *Bernheim Report,* ¶119.

61 *Bernheim Report,* ¶22. In his deposition, Dr. Bernheim testified that he was instructed to operate as if the alleged cartel in this case included STN-LCD panels. *Bernheim Depo.*, 587:14-23.

### 1. No evidence of discussion of mobile/small panel prices at the Crystal Meetings

82. For mobile and other small panels, my review of Plaintiffs' evidence indicates no discussion of prices at the Crystal meetings.[62] One would expect that if the alleged price fixing conspiracy involved small panels, the prices of these panels would be mentioned in at least some Crystal Meetings minutes.[63] Instead, my review of Plaintiff Experts' evidence of alleged communications related to small panel prices reveals only sporadic and typically bilateral communications related to specific products.

83. For Motorola purchases, Dr. Bernheim does not identify any documents as direct evidence of communications related to Motorola's purchases. Dr. Bernheim does cite evidence that Motorola's vendors possessed proprietary information on one or more of their rivals. However, it is not clear from these documents whether the information was obtained through inappropriate communication.[64]

### 2. Plaintiffs' arguments for supply-side substitution actually provide reasons why prices of different types of panels may not have moved together

84. In support of his claim of a broad conspiracy, Dr. Bernheim argues that supply-side substitution—the ability to shift capacity between different types of TFT-LCD

---

62 Indeed, Plaintiff Expert Dr. Macartney (*Macartney Report* at 50-51) states that the Crystal Meetings only record explicit agreements for prices of large-sized panels (*i.e.*, panels for TVs, monitors and notebooks), but that "discussions of sales forecasts, supply and demand, and capacity allocation for small and medium sized panels occurred as well." Dr. Macartney then cites examples of general discussions (but not about prices) related to small panels.

63 One possible reason why mobile panels were not discussed at the Crystal Meetings is that "the display module specifications including innovative and customized requirements for particular phone models could only be satisfied by a limited proportion of LCD suppliers" making them less amenable to a multilateral discussion. *See* Expert Report of Keith Mallinson, *In Re: TFT-LCD (Flat Panel) Antitrust Litigation*, *No. 3:07-md-01827 (N.D. Cal)*, February 23, 2012 (hereinafter, *Mallinson Report*), ¶88.

64 In other instances, Dr. Bernheim's evidence of information exchanges regarding small panels is vague and unsupported. For example, Dr. Bernheim cites an e-mail from John Capp, a former Sharp employee, to support the claim that Sharp and Toshiba fixed prices for panels sold to Motorola. *Bernheim Report,* ¶60, Exhibit 3298. John Capp testified, however, that he "may have overestimated [the] importance of the account, my knowledge of the account" and that he does not "think there is a basis for what I wrote" in the e-mail. *Capp Depo.*, 56:23-58:24.

panels—links small TFT-LCD panels for mobile devices with TFT-LCD panels for monitors, notebooks and TVs, causing prices to move together.[65] I agree that an alleged conspiracy focused on one type of panel would tend to reduce supply of that type of panel and possibly free up capacity to sell more of the other types of panels. But this provides no basis to conclude that all the panels must have been part of one overarching conspiracy, or that the prices of all panels must have moved together. To the contrary, as a matter of economics, it is equally possible that the Defendants focused discussion on particular types of panels and that any reduction in supply of those panels freed up capacity to produce more of the other panels.[66] If the alleged conspiracy was limited to, say, notebook and monitor panels, an obvious way to relieve pressure created by associated excess capacity would be to produce more TV panels or more small panels. Hence, the possibility of supply-side substitution actually points to reasons why prices may have moved in *opposite* directions, and even reasons why the effect of the alleged conspiracy may have been to *lower* the prices of certain products (in which case overcharges for those products would be negative).[67]

### C. EVIDENCE INDICATES THAT JAPANESE DEFENDANTS DID NOT ATTEND THE CRYSTAL MEETINGS

85. My review of the Crystal Meeting Minutes and depositions provides no evidence indicating that the Japanese Defendants initiated or attended the Crystal Meetings.[68, 69] In

---

65 *Bernheim Depo.*, 97:2-17.

66 Indeed, Dr. Bernheim acknowledged this possibility in his deposition. *Bernheim Depo.*, 584:6-585:7.

67 Firms could still have an incentive to engage in such activities if the overall effect on their profitability was positive.

68 *See, e.g.,* Deposition of Brian Lee, Vol. III, July 28, 2010, 414:14-415:4 ("Q. BY MR. SORENSEN: As far as you know, the Japanese companies didn't have anything to do with starting crystal meetings, correct? A. Yes. Q. And did you ever hear that the Japanese companies had their own crystal meetings? A. Never heard."). *See also.*, Deposition of Makoto Chiba (TMD), 86:20-97:14 (testifying that he had no knowledge of the Crystal Meetings until they became public in 2006).

69 There is some deposition testimony indicating that Sharp attended the lower level vendor meetings, which I understand are not considered part of the Crystal Meetings, but rather a series of lower-level meetings that involved general discussions about the trends in the market and general volumes or prices rather than specific discussions about panel prices. (Deposition of Irine Chen, Vol. I, April 26, 2010, 46:10-48:13, Exhibit 1601). However,

I hereby swear to the foregoing under penalty of perjury. Executed this 23rd day of February, 2012, in Washington, District of Columbia.

Dennis W. Carlton, Ph.D.