# EXHIBIT D

**Dennis W. Carlton**

University of Chicago – Chicago, USA



# *How should Economic Evidence be Presented and Evaluated?*

European University Institute
Robert Schuman Centre for Advanced Studies
2009 EU Competition Law and Policy Workshop/Proceedings

To be published in the following volume:
Claus-Dieter Ehlermann and Mel Marquis (eds.),
*European Competition Law Annual 2009:*
*Evaluation of Evidence and its Judicial Review in Competition Cases,*
Hart Publishing, Oxford and Portland (forthcoming 2010).

© Dennis W. Carlton. All rights reserved.

# How should Economic Evidence be Presented and Evaluated?

Dennis W. Carlton *

* Katherine Dusak Miller Professor of Economics, University of Chicago; National Bureau of Economic Research. I thank Thomas Barnett, John Fingleton, Ken Heyer, Gregory Pelnar, and Richard Posner for helpful comments.

## I. Introduction

The answer to the question posed in the title is an increasingly important one as the use of economics continues to increase in litigation in general and in competition policy in particular. Although the use of economics in competition policy has been important in the United States for well over 25 years, its use in Europe is fast rivaling that in the United States. Moreover with the advent of antitrust authorities throughout the world, it is clear that the use of economics will exert increasing influence worldwide on competition policy. This paper tries to make a start at answering the question of how to use, present, and evaluate economic evidence. I will raise more questions than answers, but that will hopefully stimulate thinking and debate.

I will first discuss what are the logical underpinnings to the question in the title. For example, the question presupposes that there is indeed economic evidence that is available and that has been gathered. How much should we spend on this gathering of information? Who should gather it and who should analyze it? What should be decided based on it and who should decide? Until one knows the answers to these questions, one cannot answer the question in the title. These questions are very difficult and in section II I sketch out some thoughts on them, but they must be answered before we can address the main topic. In section III, I begin to answer the question of the paper. I explain that the answer depends on whom the audience is and I explain the interplay between the audience and the way evidence should be used. I discuss the way in which an economic analysis should be structured depending on the body doing the review. In section IV, I discuss the standard of proof that one might require and show that Bayesian decision theory is the applicable tool to use to answer how to set standards of proof, but that there are practical limitations to its use. In section V, I explain what are the areas where economists are most likely to add value. I end with a plea to study what has worked best both in terms of economic analysis and in terms of the institutions that make best use of economic analysis.

Cite as: Dennis Carlton, "How should Economic Evidence be Presented and Evaluated?", in Claus-Dieter Ehlermann and Mel Marquis, eds., *European Competition Law Annual 2009: Evaluation of Evidence and its Judicial Review in Competition Cases,* forthcoming, Hart Publishing

## II. Information Gathering and Analysis

Imagine that there are no courts, agencies, or regulatory bodies, and you are asked to devise a set of rules together with their enforcement to foster competition. You have to decide what institutions to set up to enforce the rules. You can think of a variety of schemes. You can set up courts that rely on common law and generalist judges, some of whom know a lot of economics and some of whom may not. You can rely on juries who by and large will lack training in economics. You can set up a regulatory body to regulate an industry or you can set up a competition agency where the regulatory agency or competition agency has its own expertise in economics. No matter which variety of institutions you use, as long as your goals are related to economic efficiency, you need to face the fact that economic data and analysis can be helpful in whatever decision making will occur and that based on the evidence some decision maker will reach a decision. The problem I have described is very hard to solve abstractly but falls into the category of "mechanism design" recognizing that the parties involved will have asymmetric knowledge and self serving motivations and that the decision maker may have limited ability to understand economic evidence. I note that in competition policy we have a wide variety of institutions at work in various parts of the world. I am not aware of much systematic research to figure out the right mix of use of different institutions and what institutions are best for which countries based on the competency of a country's institutions.[1] I have made a start at this research in a paper with Professor Picker where we examine the use of regulatory agencies versus common law courts to establish competition policy in the United States.[2] Much more research needs to be done but I start here to stress that the areas of responsibility of the existing institutions will structure how evidence is best presented and analyzed since the presentation and analysis should differ according to the type of institutions it is being provided to. To take a somewhat fanciful example, if a two-year-old is the decision maker, improving economic analysis will not matter much to the quality of decision making. But in that situation, changing the institution will be more important than improving the economic analysis, though after the institution is changed the value of economic analysis could increase, leading to the conclusion that more resources should be invested in economic analysis.

Whatever the institution involved, one should not assume that the relevant economic evidence will be available costlessly. How much time and money should one spend to gather data? If you are a competition agency, should you spend a million dollars to investigate price fixing in an industry with sales of ten thousand dollars? One consideration is whether there is a precedential value to the investigation so that one benefit to prosecution is the deterrence of others.[3] Given that budgets are finite, the competition authority must give considerable thought as to where to spend its money. Firms spend money to comply with government requests for data or in response to litigation where economic evidence is needed. For example, in merger investigations, compliance with a second request in the United States can be

[1] Gal (2003) is a notable exception.
[2] Carlton and Picker (forthcoming).
[3] For one of the few studies that I am aware of regarding precedential value, see Office of Fair Trading (2007).

burdensome. How should an agency determine how much information to request from the merging parties and third parties? It is not a sufficient answer to say "enough to do the analysis" because the depth and quality of the analysis depends often on the resources devoted to it. In theory, one would request information up to the point where the benefits of further improving the analysis equal the added costs to all parties. There has been little analysis of how much data should be gathered by type of investigation case. Competition authorities should use whatever prosecutorial discretion they have to make sure that they are focused only on "big" cases – including ones with potentially large precedential value – when they make large data requests of firms.

In deciding how much evidence to collect, the issue is when to stop collecting information. This is a well posed question of the incremental value of information. If still another analysis of a data set will cost $1 million, will that sharpen decision making by causing the decision maker to avoid error and thereby save at least $1 million in costs (broadly interpreted) to society? It is much like asking whether the Bureau of Labor Statistics should start collecting new information. For example, in a merger case, should the top 40 executives be required to turn over their files, the top 10, or should the decision depend on the value of the commerce involved? Although performing the relevant cost-benefit calculations might practically not be possible, at the very least, it would seem reasonable that the decision should be based on the value of commerce, including commerce that might be affected based on the precedential value of the merger under analysis.

After the data are gathered, who should analyze it? Do we want a jury or judge to listen to opposing experts, or do we want a regulatory agency or a competition authority to do their own analysis? What type of subsequent judicial scrutiny of decisions should occur? And, perhaps most importantly, who should be the ultimate decision maker? I return to these questions later when I discuss specifically how evidence might be presented. But the relevant question is which institutional set up will lead to the most reliable decision ultimately being made in light of the relevant costs.

## III. Varying the Presentation According to the Audience

Although the issue of which questions should be decided by which institutions is a hard one and worthy of research, I now leave those sets of issues and ask, given the institutional set up of a particular country, how should economic evidence be presented and used? The answer depends on the quality of the institution – the comparative advantage of the institution, so to speak, at deciding and analyzing. I would say that a jury has little ability to understand complicated economic modeling and so their decisions after listening to economic testimony will be based on what reasoning sounds "right" to them (which may or may not accord with economic logic) as well as evaluating the demeanor and other traits of the expert witness. The same is true of a judge, though judges have a greater ability or at least opportunity to probe with questions what each expert is saying. This suggests that parties will present simple testimony to juries and more complicated testimony to judges, especially to judges deemed knowledgeable in economics. Yet no matter how smart a judge is, it is doubtful that he can

penetrate the very sophisticated econometric modeling that may be required for some cases. In those instances, one is back to the criteria that juries probably use – decide on the expert's reliability based on factors other than his underlying analysis.

It is exactly because reliance on experts is difficult that rules of evidence and rules of law for decision making develop. For example, in many proceedings where opposing experts appear, unless an expert provides the opposing side with his data, he cannot testify. Such rules can help clarify economic testimony and keep the expert honest. But there are limits to its effectiveness. How can a judge resolve a dispute regarding proper statistical procedure? Giving data to the opposing side is better than nothing but many times may not help much. Structured decision making is another response. For example, if the decision maker knows very little about economics, then forcing him in a merger case to define a market and then calculate market shares may well produce better decisions than allowing him to use his own analysis to decide whether the merger creates adverse competitive effects. This is so even though economists often disparage the use of markets and market shares as nothing but crude concepts that can lead to error. There is a difference between structuring rules for a non-economist decision maker versus telling a Nobel Laureate in economics to analyze the problem with the best economic tools available.

The use of *per se* rules against price fixing in the United States illustrates why it can be sensible to have fixed rules. There are *per se* rules not because price fixing is always bad, but rather because it is believed to be typically bad, and it is further believed that courts have little ability to identify the circumstances where it is good, even after a detailed and costly investigation. Hence, it minimizes the cost of expected error to tell courts not to analyze the rationale for the behavior and simply declare it illegal. (This is a bit of an overstatement because "price fixing" that is "good" is labeled something else – as, *e.g.*, in the case of the formation of a procompetitive joint venture. Maybe it would be more accurate to say that "naked" price fixing where people sit around a table and secretly set prices is *per se* illegal.) Applying the same type of reasoning to the many competition authorities around the world, it would make sense for new competition authorities with little or no experience or expertise in competition law or economics to start with a law with simple rules such as "price fixing is illegal". As the expertise in either the courts or competition authority grows, one can gradually add new conditions to which competition law apply and give the decision maker more scope for discretion. The movement in the United States from *per se* rules toward rule of reason is a good example of this evolution as experience grows.

Regulatory bodies and competition agencies that employ a staff of economists will (or should) be better suited to evaluating sophisticated economic arguments than courts. One should expect that the form of the economic arguments should change considerably when, say, merging firms get sued by a competition agency and the focus shifts from persuading the competition authority to persuading a court. The economic arguments will undoubtedly become simpler to suit the courts and the reliance on crude concepts such as "markets" for decision making will increase. This means that a competition agency has an enormous responsibility to use prosecutorial discretion, when such discretion exists, in deciding which cases to pursue in court because simplified rules used by courts may frequently generate the

wrong result when used in complicated settings. For example, consider a merger involving airlines with significant networks. It will undoubtedly be true that some routes will be better served and others more poorly served after the merger. I assume that there is no simple fix to the transaction that preserves the benefits but eliminates the harms – *i.e.*, in the language of the United States Merger Guidelines, the benefits are "inextricably" linked to the harms. Should the agency weigh the harm to one set of consumers off against the benefits to the other set? The answer is surely yes, though technically in the United States under the Clayton Act that is not entirely clear. Suppose, on balance, the government agency decides that the harms exceed the benefits and proceeds to try to block the merger in court. The government may argue that some set of consumers in some affected markets are harmed and that this justifies stopping the merger. That is, the government agency may, to maximize its chances of prevailing at trial, rely on a narrow interpretation of the rules, even though those rules may make little economic sense.

If one is before a competition agency, how should the economic analysis proceed? It seems to me that when there are two sets of economists – one for the government and one for the firm being investigated – both sides have a duty to be transparent. The government, to the extent allowed by any third party confidentiality requirements, should pose the relevant questions and should explain its reaction to the analysis presented by the firm's economic expert. The government should reveal what analysis it has done, and should let the firm know what statistical analyses it finds persuasive and which it finds unpersuasive. Similarly, the firm's economic expert should provide the competition agency an opportunity to examine and analyze his data and modeling. If there is a difference of opinion between the two sides, the reason for the difference of opinion should be identified in order to narrow it. I have found that something as simple as different, though similar, data sets can explain divergences in opinions. Sometimes one can obtain a consensus on what data to use and then narrow at least some differences.

This back and forth between opposing economists differs from case to case depending on the personalities of the lawyers (and economists) involved. One recommendation of the Antitrust Modernization Commission[4], a Congressional Commission created to evaluate the need to update the United States antitrust laws, was to foster such interaction. My own sense is that communication between the economists without any lawyers involved might facilitate such interaction, though it might make the lawyers nervous. In the context of litigation either before a court or regulatory body, the use of a neutral court-appointed expert can facilitate the presentation of economic testimony. The neutral expert could help define the economic questions that the court wants answered, as well as those it does not want the economists to answer. Moreover, if one is doing a complicated economic analysis, a neutral expert can resolve certain issues so that certain investigatory paths do not have to be followed. For example, suppose that I want to analyze switching behavior in response to price changes but I lack data on the price changes. Suppose further that I devise a way to estimate the price changes but the neutral expert is unpersuaded that I can do so accurately. Then, there is no

---

[4] I served as a Commissioner.

point to having me do a complicated demand analysis if it will be dismissed because my price data are deemed inaccurate.

Neutral economic experts can streamline testimony by being clear as to what experts cannot testify about. For example, in a price fixing conspiracy, there is no need to show a document to an economist and ask him if it shows a "meeting of the minds". As George Stigler once pointed out, such attempts to elicit essentially legal opinions from economists whose reading ability is not superior to the ordinary person's and who may not even be sure what the law means by its requirement that there is a 'meeting of the minds", do not draw upon any economic expertise.[5]

In court or administrative proceedings, one should ask whether direct testimony followed by cross examination is the best way to convey economic analysis to a judge or jury or administrative body. Especially where there is a disagreement among experts, having the two experts directly confront each other to contrast their views can clarify or eliminate differences. In New Zealand, I have testified in a "hot tub" with opposing experts. As I recall, I made a short opening statement and then was cross examined. The cross examiner could also ask his expert to respond to my answer. Similarly, my lawyer could ask me to respond to the opposing expert's answers to cross examination. I was able to ask my lawyer to ask the opposing expert questions. In comparison to my testimonial experience in the United States, I found my New Zealand experience a much clearer way of presenting testimony to a court and getting the court to understand the precise areas of disagreement between the experts. In the usual trial in the United States, by the time one expert is off the stand, there may have been so many questions of that expert that no judge or jury can readily keep track of them, let alone evaluate the merits of all the areas of disagreement after the opposing expert testifies.

## IV. Evaluation of the Evidence – Standards of Proof

In asking what level of certainty one needs before declaring that some firm has violated a competition law, it sounds like one is asking a purely statistical question regarding hypothesis testing. But that is not really so. As many books on statistics explain when a decision must be made and there is some uncertainty as to the consequences of the decision, it is the loss function of the decision maker (or the loss function of the institution delegating the decision) that should be used to decide the "level of proof". For example, suppose that there are two types of firms, guilty and innocent. If a court correctly labels a firm guilty and punishes it, suppose nothing changes. If it fails to detect guilt when it is present, firms have an incentive to violate the law, and suppose that loss to society rises to $100. If it correctly labels a firm as innocent, suppose that nothing changes. If it falsely labels an innocent firm as guilty then competition is chilled and suppose society suffers a loss of $1,000. The expected loss (L) to society is:

[5] See Carlton, Gertner, and Rosenfield (1997) for an analysis of the word "agreement" from an economic viewpoint and the ambiguity of the legal definition in price fixing cases.

$$L = P(G)[P(G^1|G) \times 0 + P(I^1|G) \times \$100] + P(I)[P(G^1|I) \times \$1000 + P(I^1|I) \times 0],$$

where $P(G)$ = probability of guilt of a randomly drawn firm,
$P(I)$ = probability of innocence of a randomly drawn firm,
$P(G^1|G)$ = probability the firm is declared guilty if it is guilty,
$P(I^1|G)$ = probability the firm is declared innocent if it is guilty,
$P(G^1|I)$ = probability the firm is declared guilty if it is innocent,
$P(I^1|I)$ = probability the firm is declared innocent if it is innocent, or

$$L = P(G)\ P(I^1|G) \times 100 + P(I)\ P(G^1|I) \times 1000.$$

Classical hypothesis testing, as employed in economics, typically uses what is called a 5% significance level. One designates a "null hypothesis" – *e.g.*, the person is guilty – and rejects the null hypothesis (*i.e.*, rejects that the person is guilty) when the observed evidence has a 5% chance or less of being observed if in fact the person is guilty. (In the above notation, $P(I^1|G)$ is less than or equal to 5%.)

But this customary practice in the economics profession is well known not to be the optimal Bayesian decision rule for minimizing loss L. In other words, one might want to adjust the standard so as to trade off one type of error ( $P(I^1|G)$ ) against another ( $P(G^1|I)$) based on how costly each type of error is. I have never been involved in a proceeding where this type of Bayesian decision theory has been explicitly applied, probably because it is too complicated to implement easily. I mention it only to emphasize that what might be a customary statistical norm (*e.g.*, a 5% significance level) for an academic discipline (economics) need not be an optimal decision rule for a court or regulatory body to use.[6]

This divergence between the optimal statistical decision and the norm of an academic discipline emphasizes that courts do more than a simple statistical test of a single hypothesis in deciding a case. Instead courts typically use many pieces of evidence in evaluating a case, pool the information together, and then make a decision. If the evidence, for example, shows that at a 6% significance level, price increased (though not at a 5% level), the strength of the evidence in favor of a price fixing conspiracy is weaker than had the significance level been 5% but it would be an error for the court to dismiss the evidence entirely. It seems to me that generally courts recognize this error and try to avoid it. It is also why a court or an economic expert should rely on more than one piece of economic evidence. For example, again returning to the price fixing example, suppose one observes that prices rise during the conspiracy but only at the 10% significance level, but suppose one also observes that the standard pattern of new product improvement slowed, but again at only the 10% significance level. The likelihood that <u>both</u> events occur if there is no conspiracy (and for simplicity assume the events are independent in the absence of conspiracy) is .1 times .1, or .01! That is,

---

[6] For further discussion of these issues, see, *e.g.*, Beckner and Salop (1999) and Heyer (2005). Note that requiring a higher standard of proof for criminal versus civil cases could be interpreted as reflecting a higher error cost of falsely convicting in a criminal versus civil trial.

the null hypothesis of "no conspiracy" can be rejected at the 1% significance level! Again, agencies and courts rarely combine this evidence formally, but it shows how different pieces of evidence can be combined in decision making.

## V. Where Can Economic Testimony be Most Helpful?

Competition policy covers a lot of topics, perhaps too many for many jurisdictions. Most competition policies deal with price fixing, mergers, and various unilateral practices such as tie-in sales and exclusive distribution policies. Economists do have useful knowledge about each of these areas but I think that there are some areas where the economist's tools are better suited than others. Let me discuss each type of case in turn. (I do not repeat the previous discussion having to do with applying economic analysis to figure out the optimal institutional design for implementing competition policy.)

*Price fixing*

As I have already mentioned, George Stigler once pointed out that economists can interpret documents no better, and likely worse, than lawyers. Asking an economist to read a document and discern its hidden meaning is just not a skill that economists are trained to do. An economist is trained to know what elements one needs in order to have a successful price fixing conspiracy. So, if asked, he could opine that certain elements such as information about price, monitoring of others' prices and sales, and punishment mechanisms for price cheaters, all can be important ingredients for a price fixing conspiracy to succeed. He could also describe the typical number of participants in price fixing conspiracies as well as the typical price overcharge for domestic and international conspiracies. All this may be especially useful in analyzing damages. If one thinks that the conspiracy is poorly set up then one should not be surprised to find an ineffective conspiracy with low damages. Conversely, if there is a carefully crafted mechanism in place to facilitate price fixing, one should not be surprised to uncover large damages. The economist can use pretty standard econometric tools to test how elevated prices are during the alleged conspiracy provided data exist for periods of alleged conspiracy and periods when there is no conspiracy. No doubt, opposing experts will come up with different models of damages, and it will be difficult for a non-expert to resolve the differences. That is where a neutral expert could help a judge, or where the presence of a trained staff of economists in a competition agency can help.

One subtlety that is often ignored in such cases of price fixing is what I call a self-selection effect. At least in the United States where we have class actions, some plaintiffs' attorneys may watch for any large drop in price and if one occurs bring a class action suit alleging price fixing. But, in some markets, large price fluctuations occur naturally so if plaintiffs' attorneys do bring cases at least in part by observing large price declines, there is a

natural self-selected quality to the data that will lead to a finding of price effect even when there is no conspiracy. It is rare to see anyone account for this effect.[7]

Most conspiracy cases involve allegations of price fixing, but of course firms could conspire on relevant competitive terms other than price. For example, firms could agree not to compete on product quality or agree not to innovate. It is more difficult to calculate the harm from such conspiracies though the empirical techniques to do so are well understood. It is fair to say that economists have done fewer such calculations of harm from suppressed product innovation than from price elevation. One could reasonably expect that the former calculation is likely more subject to error than the latter.

*Mergers*

With all the mergers that competition agencies and courts have evaluated, there is a huge bag of tools that economists can bring to the analysis of whether a particular merger will raise price. One useful place to start is with market definition. Many economists, myself included, find the notion extremely crude and inexact. Its use often leads to error because of its insistence that a product is either "in" or "out" of a market.[8] Yet, despite its logical difficulties, I find that use of a market definition can force a court, especially with a jury, to make more logical decisions than it would absent any discipline on what evidence it uses in its decision making.

Second, the central question in a merger is often whether price will rise after the merger. That question can sometimes be completely answered by looking whether there are any cases (or time periods) when there were fewer competitors, and if so, what was the result, after adjusting for other relevant economic factors. This type of analysis needs there to be a different number of firms in different areas of the country (or in different time periods). What is required for the analysis to be helpful is that the number of firms should, for exogenous reasons, differ across different areas. For example, suppose one is considering a merger of two railroads. At least in the United States, there are few new railroads being built and so the number of railroads in any area generally depends on how many were there 50 years ago. In that case, the number of railroads will not depend upon the current price and so it is useful to examine the difference in rail rates between locations served by one railroad, two railroads, and three railroads in order to understand the effect of a merger on reducing competition, after adjusting for other relevant economic factors.

A more sophisticated technique to predict the price effect of a merger is merger simulation, which involves an estimate of demand facing firms together with an assumption of how firms compete. Standard assumptions about how firms compete include Cournot (quantity-taking) and Bertrand (price-taking) behavior – with Bertrand behavior typically producing a more competitive outcome than Cournot behavior. One can then analyze what the estimated demand curves predict regarding prices post-merger once one firm gains control of

---

[7] See Carlton and Leonard (2004).
[8] See Carlton (2007).

pricing of multiple products and can take their interaction into account. As with any economic modeling, one has to make sure that one's results are not overly sensitive to particular assumptions, and one must evaluate any results in the context of the case, but merger simulation can add useful evidence to an analysis.

It is of course possible to criticize any use of an economic analysis because, by the very nature, it must make simplifying assumptions. I think it would be a mistake to ignore economic evidence on this basis. Instead, the weight one gives to the evidence can be adjusted depending on the applicability of the assumptions. Claiming that economics is both too complicated (*e.g.*, merger simulation requires solving lots of nonlinear equations) and too simple (*e.g.*, the assumption used in merger simulations of Bertrand competition ignores dynamics) to rely on in competition proceedings ignores the fact that at least in the United States its use has improved the field of antitrust, especially over the last thirty years.

A merger, of course, can raise questions about matters other than price. Will the merger lead to product withdrawal or slow the pace of technological change? Although economists do know something about these matters, empirical generalizations are difficult and our predictive ability is not as good as it is in predicting price effects of a merger. When these matters are the focus of a merger investigation, one should recognize that a) the decision is subject to greater error than otherwise, and b) the best evidence is likely to come from examination of the history of the particular industry and relevant evidence about likely future trends.

*Vertical – Non-Horizontal Cases*

One of the most difficult and dangerous areas for competition policy involves non-horizontal cases. I label this area "dangerous" because it is the area where the competition laws can most easily be subverted to protect competitors from competition. In the United States, "exclusionary conduct" can "foreclose" a rival from competing. But that is what tough competition does and the danger lies in confusing tough competition from conduct that impedes competition. I would impose a high evidentiary requirement before admitting such claims. Specifically I would not consider an economist's testimony convincing solely on the basis of a theory that such a harm to competition would occur. I would require some attempt to obtain empirical confirmation of the theory. My sense is that the enforcement of non-horizontal competition policy creates the greatest opportunity for harm on the part of competition authorities if they wind up protecting inefficient competitors.

## VI. How to Figure Out How to Make Economics More Useful

Despite the fact that economics relies heavily on empirical analysis, there is a dearth of empirical studies as to its effectiveness in competition policy. These are at least two types of questions that need to be investigated. First, what institutional arrangements work best for reaching the correct decision? How often do judges, juries, "hot tubs", regulatory bodies, and government agencies get it "right"? Second, how good are the analyses of the economic

staffs of the government competition agencies? It is possible, for example, to evaluate which economic modeling techniques and which economic staffs have the best track record in, for example, analyzing mergers.[9] Only after a study of both topics will we know how to design institutions and to use economic tools to improve decision-making in competition policy.

## Bibliography

Beckner, C. Frederick III, and Steven C. Salop. 1999. "Decision Theory and Antitrust Rules," 67 *Antitrust Law Journal* 41

Carlton, Dennis W. 2007. "Market Definition: Use and Abuse," 3 *Competition Policy International* 3 (Spring)

Carlton, Dennis W. 2009. "Why We Need to Measure the Effect of Merger Policy and How to Do It," 5 *Competition Policy International* 77 (Spring)

Carlton, Dennis W., Robert H. Gertner, and Andrew M. Rosenfield. 1997. "Communication among Competitors: Game Theory and Antitrust," 5 *George Mason Law Review* 423

Carlton, Dennis W., and Gregory Leonard. 2004. Appendix I to "Using Economics to Improve Antitrust Policy," 2004 *Columbia Business Law Review* 283

Carlton, Dennis W., and Randal C. Picker. Forthcoming. "Antitrust and Regulation," in Nancy L. Rose, ed., *Economic Regulation and Its Reform: What Have We Learned?,* National Bureau of Economic Research

Gal, Michal S. 2003. *Competition Policy for Small Market Economies*, Harvard University Press

Heyer, Ken. 2005. "A World of Uncertainty: Economics and the Globalization of Antitrust," 72 *Antitrust Law Journal* 375

Office of Fair Trading. 2007. "The Deterrent Effect of Competition Enforcement by the OFT: a report prepared for the OFT by Deloitte."

---

[9] See Carlton (2009).

Cite as: Dennis Carlton, "How should Economic Evidence be Presented and Evaluated?", in Claus-Dieter Ehlermann and Mel Marquis, eds., *European Competition Law Annual 2009: Evaluation of Evidence and its Judicial Review in Competition Cases,* forthcoming, Hart Publishing