# EXHIBIT E

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | | |
|---|---|---|
| IN RE: TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION | ) | Master File No. C07-1827 SI |
| | ) | MDL No. 1827 |
| This Document Relates to: | ) | |
| Motorola Mobility, Inc. | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| AU OPTRONICS CORPORATION et al., | ) | |
| Defendants | ) | |

# EXPERT REPORT OF PROFESSOR DENNIS W. CARLTON

**February 23, 2012**

**Table IV-3: Share of Industry Revenue at Transaction Prices below Midpoint or Lowest Price Communicated at Crystal Meetings, by Panel**

| Panel | Revenue Below Midpoint Communicated Price | Revenue Below Lowest Communicated Price |
|---|---|---|
| Television 32" | 74.0% | 63.2% |
| Television 26" | 71.0% | 54.4% |
| Television 40" | 51.7% | 51.2% |
| Television 27" | 98.9% | 98.9% |
| Television 30" | 57.9% | 40.3% |
| Television 23" | 53.5% | 43.3% |
| Television 15" | 42.6% | 37.3% |
| Television 37" | 16.9% | 9.3% |
| Television 17" | 52.4% | 38.2% |
| Television 14" | 100.0% | 100.0% |
| Television 22" | 75.4% | 95.6% |
| Television 20" | 0.0% | 0.0% |
| **Average for Panels without Display Standard Information** | **69.7%** | **60.3%** |

Sources: Defendants' transaction data; Plaintiff Experts' meeting prices and documents.

# V. THE TFT-LCD INDUSTRY AND THE ALLEGED CARTEL EXHIBIT MANY CHARACTERISTICS THAT HINDER A CARTEL'S ABILITY TO RAISE PRICE SIGNIFICANTLY

94. In the previous sections of this report, I have set out the background of the TFT-LCD industry and explained why the documentary record of meetings, however lengthy, does not substitute for actual economic analysis of whether there were significant overcharges. In this section, I go on to demonstrate that economic theory applied to the relevant facts about the TFT-LCD industry and the alleged cartel also cannot establish that the alleged cartel significantly inflated prices. The TFT-LCD industry and the alleged cartel exhibit many characteristics that are known to hinder cartels' ability to raise price significantly.

95. Following this section, the remainder of this report explains that available empirical evidence shows at most small price effects from the alleged cartel activities. This result is not surprising in light of the characteristics of the TFT-LCD industry that I discuss in this Section.

96. I recognize that Dr. Bernheim apparently disagrees with me and instead believes that the characteristics of the TFT-LCD industry make it prone to allowing a cartel to be successful. I include references to certain arguments on these topics made by Dr. Bernheim. However, the fact that there may be economic theories under which the alleged cartel could have succeeded, as well as theories that indicate it likely failed (presented below), proves only that the actual success or failure of the alleged cartel is an open question that needs to be resolved empirically, which is one of my main conclusions.

### A. ECONOMIC THEORY OF CARTELS

97. As described above, the record in this matter indicates that there were numerous communications among various subsets of the Defendants between 2001 and 2006. However, neither the fact of these meetings nor the admission of liability by some of the Defendants' executives automatically implies that prices were increased significantly. This is because an agreement among horizontal competitors to raise prices may fail to raise prices significantly above those that would have prevailed in the absence of the agreement. Although companies may desire to form a cartel to raise industry profits, economic conditions in the industry and each firm's strong, individual incentive to maximize its own profits may prevent the firms from carrying out their joint plan. Indeed, a large body of economic literature establishes that attempts by cartels to raise prices may not be successful.[81]

98. The economic theory of cartels assumes that firms desire to maximize their profits.[82] If firms could agree jointly to reduce industry output and raise prices, then industry profits could increase over the level of profits that would otherwise exist. However, although a joint agreement to reduce output and raise price could increase

---

81 For a survey of the literature, *see*, Margaret C. Levenstein and Valerie Y. Suslow (2006), "What Determines Cartel Success?" *Journal of Economic Literature*, 44(1) (hereinafter, *Levenstein and Suslow* (2006)) at 45. Levenstein and Suslow note, for example, that "[t]here are cases where cartels have continued to exist on paper for many years with little sustained effect on price."

82 For a discussion of the theory of cartels, *see* Dennis W. Carlton and Jeffrey M. Perloff (2005), *Modern Industrial Organization*, 4th edition (hereinafter, *Carlton and Perloff* (2005)), at Chapter 5.

industry profits, there are significant internal and external constraints to the successful implementation of such an agreement.

99. The external constraints come from firms not in the alleged cartel. These constraints arise if there are firms that do not participate in the cartel and that have the capacity to expand output significantly, or if there are new firms that can enter. Either of these possibilities threatens the cartel because the cartel's efforts to increase prices (and therefore drive profits up) will attract additional output—either from non-participants that increase production in response to the higher prices or from new firms that enter the industry. Hence, a cartel will likely be unsuccessful in sustaining lower output and a corresponding higher price when expansion of non-cartel members or entry can occur easily.[83, 84]

100. Economic theory also makes clear that, even in situations in which external constraints are limited, cartels are far from guaranteed to succeed; they may break from within. Indeed, economists have argued that the internal constraints—the incentives for each member of the cartel to capitalize on the fact that other cartel members are setting higher prices and selling less output in order to capture more of the market through lower prices—are the primary reason why cartels often fail. As Stigler (1964) explained:[85]

---

83 Blum (2007) examines the East German cement cartel over the period 1997-2002. He concludes that the cartel was not effective before 2001, and a price war erupted in 2002, due to increased imports. "Most likely, imports from Poland and Czech Republic were dumped into the East German market, and some medium-sized producers were responsible for the cartel never working." (Ulrich Blum (2007), "The East German Cement Cartel: Cartel Efficiency and Policy After Economic Transformation," *Eastern European Economics* 45(6) at 5.)

84 Hillman (2010) discusses the international tin cartel created by a series of intergovernmental agreements beginning in the 1920s. The International Tin Committee (1927-56) was given the power to control production. It was succeeded by the International Tin Council, which formed six agreements over the period 1956-1986. Hillman attributes the eventual failure of the cartel to the stimulative effect of higher prices. "Diagnosis of the ultimate source of the failure of the Council has pointed in the direction of price policy. Prices were set too high, reducing consumption and stimulating outside production." (John Hillman (2010), *The International Tin Cartel*, Routledge at 367.)

85 George J. Stigler (1964), "A Theory of Oligopoly," *Journal of Political Economy* 72(1) at 46.

> It is a well-established proposition that if any member of the agreement can secretly violate it, he will gain larger profits than by conforming to it… If price is above marginal cost, marginal revenue will be only slightly less than price (and hence above marginal cost) for price cuts by this one seller.

101. Put simply, the internal constraints arise because the incentives of individual cartel members conflict with the incentives of the group. Although firms are jointly better off if they all agree to raise price, *any individual firm, is better off if, having convinced other firms to raise their prices, it undercuts the agreed-upon price*. Generally, every firm that is a party to a cartel agreement has an individual incentive to undercut the agreed-upon price. This conflict between the incentives of individual firms and the incentives of the group acting together can make it difficult to maintain a cartel and is known to lead to cartel breakdown, as cartel members often cheat on agreements.

102. An effective punishment mechanism that reduces or eliminates the profits from cheating can enhance cartel effectiveness.[86] A common punishment mechanism is for other cartel participants to expand output and reduce price in response to perceived cheating on an agreement. When this occurs, however, prices can rapidly decline, falling to or even below competitive levels, creating periods of time when cartels do not inflate prices.[87] The economic literature provides numerous case studies of cartels that punished cheaters by cutting prices or reverting to competition, *e.g.*, the diamond cartel[88] and the lysine cartel.[89]

---

86 *Carlton and Perloff* (2005) at 142. Price wars may also result from a cartel simply breaking down, with many members defecting from the agreement. That is, price declines may represent attempts to discipline cheating or a breakdown of the cartel. In either case, the effect is the same: a temporary or permanent reduction in price.

87 *See* Andreu Mas-Colell, Michael Whinston, and Jerry Green (1995), *Microeconomic Theory*, Oxford University Press at 420-421

88 In a study of the diamond cartel, Bergenstock, Deily, and Taylor (2006) stated that "cartel members have occasionally cheated, and De Beers has a reputation for aggressive action against anyone threatening the long-run stability of the diamond market." They gave two examples of such punishment. First, "in the early 1980s, De Beers is alleged to have punished Zaire for attempting to leave the cartel by flooding the market with the low-quality industrial diamonds that were Zaire's principal product." Second, "De Beer's greatly increased its sales of low-quality rough diamonds to Indian diamond cutters in 1996 when Argyle, an Australian company, left the cartel…" (Donna J. Bergenstock, Mary E. Deily, and Larry W. Taylor (2006), "A Cartel's Response to Cheating: An

103. Despite the evidence presented in Section IV indicating widespread cheating on (or inability to adhere to) Crystal Meeting prices, Plaintiff Experts offer no meaningful evidence to establish that effective punishments were carried out. Dr. Bernheim claims that cheating can be detected (and punished) because each Defendant needs only to observe its own sales to infer whether others are cheating by over-producing.[90] What Dr. Bernheim does not mention is that the theoretical economic models that support this claim also note that a firm's own sales can be a highly imperfect signal for whether other firms are cheating (*e.g.,* sales below expectations may be due to negative demand shocks rather than cheating). Thus, a cartel's efforts to raise price could actually degrade into price wars because of perceived, even if not actual, cheating.[91] Hence, such models help to explain why cartels may fail to raise prices, at least in some periods.

104. The extent to which the internal and external constraints on cartel stability hinder the ability of the cartel to raise price depends on the specifics of the industry in question. Hence, an analysis of the likelihood of success of the alleged cartel activities in the TFT-LCD industry must begin with an intensive, fact-based analysis of the characteristics of the industry and alleged cartel activities to see whether it is or is not likely to support a successful price-fixing cartel.

105. A careful evaluation of the TFT-LCD industry reveals that among its fundamental characteristics are precisely those that hinder a cartel's ability to raise prices

---

Empirical Investigation of the De Beers Diamond Empire," *Southern Economic Journal* 73(1) at 174.)

89 Yuliya Bolotova, John M. Connor, and Douglas J. Miller (2008), "The Impact of Collusion on Price Behavior: Empirical Results from Two Recent Cases," 26 *International Journal of Industrial Organization*.

90 *Bernheim Report*, ¶73 ("It goes without saying that every company can observe its own prices and sales. But that ability by itself implies an imperfect ability to infer compliance by others. Why? If others are not complying, the company's sales will be lower than if they are complying. Hence, higher sales can be taken as indicating a higher likelihood of compliance by others.").

91 *See, e.g.,* Edward J. Green and Robert H. Porter (1984), "Noncooperative Collusion Under Imperfect Price Information, *Econometrica,* 52(1):87-100 at 89-90 (hereinafter, *Green and Porter)*.

I hereby swear to the foregoing under penalty of perjury. Executed this 23rd day of February, 2012, in Washington, District of Columbia.

Dennis W. Carlton, Ph.D.