**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Motorola Mobility, Inc. | ) | No. 1:09-cv-06610 |
| | ) | |
| v. | ) | Hon. Joan B. Gottschall, J. |
| | ) | |
| AU Optronics Corporation, et al. | ) | |

**SHARP DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO MOTOROLA MOBILITY LLC'S MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DR. ROBERT D. WILLIG**

# TABLE OF CONTENTS


INTRODUCTION ........................................................................................................ 1

LEGAL STANDARD.................................................................................................. 2

ARGUMENT ............................................................................................................ 3

A. Dr. Willig's Analysis is Reliable Because It is Grounded in Well-Established Economic Principles. ........................................................................... 3

B. Dr. Willig Reliably Applied the Seven-Factor Test to the Documents .................. 7

1. Dr. Willig's first and fifth prongs reliably assessed whether documents were direct communications between competitors. .................................... 7

2. Dr. Willig reliably applied the third prong requiring communications by significant suppliers of Motorola products ................................................ 9

3. Dr. Willig reliably applied prong four's requirement that the communication be between individuals working in TFT-LCD supply divisions ...................................................................................... 10

C. Motorola Mischaracterizes Dr. Willig's Methodology and Conclusion About Competition in the TFT-LCD Market................................................................. 11

D. Dr. Willig's Opinion Does Not Interfere with the Role of the Jury ..................... 12

CONCLUSION......................................................................................................... 14

# TABLE OF AUTHORITIES

## CASES

*Agnew v. Nat'l Collegiate Athletic Ass'n*,
683 F.3d 328 (7th Cir. 2012) ....................14

*Aventis Envtl. Science USA LP v. Scotts Co.*,
383 F. Supp. 2d 488 (S.D.N.Y. 2005)....................14

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999)....................14

*City of Tuscaloosa v. Harcros Chems., Inc.*,
158 F.3d 548 (11th Cir. 1998) ....................13

*Cook v. Rockwell Int'l Corp.*,
580 F. Supp. 2d 1071 (D. Colo. 2006)....................6

*Daubert v. Merrell Dow Pharms, Inc.*,
509 U.S. 579 (1993)....................2, 3

*Deimer v. Cincinnati Sub-Zero Prods., Inc.*,
58 F.3d 341 (7th Cir. 1995) ....................9

*Fleischman v. Albany Med. Center*,
728 F. Supp. 2d 130 (N.D.N.Y. 2010)....................4, 12, 13

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)....................12

*In re High Fructose Corn Syrup Antitrust Litig.*,
295 F.3d 651 (7th Cir. 2002) ....................4

*Jamsports & Entm't, LLC v. Paradama Prods., Inc.*,
No. 02-cv-2298, 2005 WL 14917 (N.D. Ill. Jan. 3, 2005)....................13

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999)....................2

*Lapsley v. Xtek, Inc.*,
689 F.3d 802 (7th Cir. 2012) ....................2, 5

*Manpower, Inc. v. Ins. Co. of Penn.*,
732 F.3d 796 (7th Cir. 2013) ....................3, 7

*In re Polypropylene Carpet Antitrust Litig.*,
93 F. Supp. 2d 1348 (N.D. Ga. 2000)....................4

*Reed v. Advocate Health Care*,
268 F.R.D. 573 (N.D. Ill. 2009)....................5

*Sheehan v. Daily Racing Form, Inc.*,
104 F.3d 940 (7th Cir. 1997) ....................8

*Smith v. Ford Motor Co.*,
215 F.3d 713 (7th Cir. 2000) ....................2, 3

*Sommerfield v. City of Chicago*,
254 F.R.D. 317 (N.D. Ill. 2008)....................2

*Southwire Co. v. J.P. Morgan Chase & Co.*,
528 F. Supp. 2d 908 (W.D. Wis. 2007) ....................3, 10

*Srail v. Vill. of Lisle*,
249 F.R.D. 544 (N.D. Ill. 2008)....................5

*Stollings v. Ryobi Techs., Inc.*,
725 F.3d 753 (7th Cir. 2013) ....................3

*TC Sys., Inc. v. Town of Colonie*,
213 F. Supp. 2d 171 (N.D.N.Y. 2002)....................3

*In re Titanium Dioxide Antitrust Litig.*,
No. RBD-10-0318, 2013 WL 1855980 (D. Md. May 1, 2013) ....................4, 5

*United States v. Rubin*,
999 F.2d 194 (7th Cir. 1993) ....................8

*United States v. U.S. Gypsum Co.*,
438 U.S. 422 (1978)....................14

*U.S. Info. Sys. v. IBEW Local Union No. 3*,
313 F. Supp. 2d 213 (S.D.N.Y. 2004)....................4

*In re Urethane Antitrust Litig.*,
No. 04–1616–JWL, 2012 WL 6681783 (D. Kan. Dec. 21, 2012) ....................4

**OTHER AUTHORITIES**

Fed. R. Evid. 702 ....................2

Fed. R. Evid. 705 ....................11

## INTRODUCTION

Sharp retained Dr. Robert D. Willig—a Princeton economist and former Deputy Assistant Attorney General in the U.S. DOJ's Antitrust Division—to "analyze the economic implications of alleged exchanges of information between Sharp and other suppliers of TFT-LCD panels" and any corresponding price movements to assist the Court and jury in determining where the evidence is "indicative of agreements to fix prices of TFT-LCD panels sold to Motorola" and where it merely reflects information exchanges. (Ex. A, Exp. Rep. of Dr. Willig ¶ 4, 44.) Based on his analysis, Dr. Willig identified one such episode during the plea period.[1] He further opined that when the communications and price movements are viewed in their "proper economic framework," they reflect that Sharp and other suppliers acted as true and vigorous competitors, and that any agreement to fix prices was sporadic and limited in duration. (*Id.* ¶¶ 5, 39, 48.)

Motorola centrally contends that Dr. Willig's testimony should be excluded because he does not employ any recognized methodology but merely usurps the role of the jury by assessing evidence and drawing conclusions. But Motorola obfuscates the point of Dr. Willig's testimony: his opinion and testimony will provide critical assistance to the jury by identifying and applying key economic distinctions between evidence that indicates mere information sharing and that which indicates impermissible price-fixing. Information exchanges can have "procompetitive advantages" and "need not imply anticompetitive conduct."[2] (*Id.* ¶¶ 23, 29.) Drawing such

---

[1] The "plea period" is "the fall of 2005 to the middle of 2006," the time frame when, according to its guilty plea, Sharp Corporation was a participant in a conspiracy to fix prices of TFT-LCD panels sold to Motorola for use in Razr mobile phones. (*See* Ex. B, Plea Agreement ¶ 2, *United States v. Sharp Corp.*, No. 3:08-cr-00802 (N.D. Cal. Dec. 8, 2008).)

[2] Motorola's own economic expert, Dr. Douglas Bernheim, supports this position. (*See* Ex. C, Bernheim Test., *In re: TFT-LCD (Flat-Panel) Antitrust Litig.*, No. C 07-MDL-1827, Trial Tr. Vol. 10, 1490:1-17, Aug. 6, 2013 ( "To compete effectively, a company has to understand its market. . . . If it knows what others are charging, it may be able to undercut that, charge a better price. . . . So, there definitely can be communications amongst firms that are pro-competitive, rather than anti-competitive.").)

distinctions is the province of an economic expert and will permit the jury to assess the factual evidence under a sound economic framework based on generally accepted economic principles.

Dr. Willig's methodology uses seven criteria—each grounded in established economic theory—to help the jury distinguish between those communications between Sharp and other TFT-LCD suppliers that may be indicative of an agreement to fix prices and those constituting only an information exchange. (*Id.* ¶ 40.) Other courts have recognized that in price-fixing cases, an expert's identification of economic factors informing the price-fixing analysis meets the *Daubert* standard of reliability, particularly where the "basic ideas" supporting the analysis are "common among economists" and "economically correct." (Ex. D, Willig Dep., 172:25, 173:1-2, 174:14, Apr. 18, 2012.) Any quibbles that Motorola has with Dr. Willig's opinions go to their weight—not their admissibility.

## LEGAL STANDARD

Expert opinion testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. "This condition goes primarily to relevance." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993). "Expert testimony is helpful to the jury if it concerns a matter beyond the understanding of the average person" or "assists the jury in understanding facts in the record." *Sommerfield v. City of Chicago*, 254 F.R.D. 317, 329 (N.D. Ill. 2008).

The *Daubert* inquiry "is fact-dependent and flexible." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 810 (7th Cir. 2012). "*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). Moreover, "no single factor among the traditional *Daubert* list is conclusive in determining whether the methodology relied on by a[n] . . . expert is reliable." *Smith v. Ford Motor Co.*, 215 F.3d 713, 720 (7th Cir. 2000). "There is no single requirement for admissibility

as long as the proffer indicates that the expert evidence is reliable and relevant." *Southwire Co. v. J.P. Morgan Chase & Co.*, 528 F. Supp. 2d 908, 927 (W.D. Wis. 2007).[3]

**ARGUMENT**

**A. Dr. Willig's Analysis is Reliable Because It is Grounded in Well-Established Economic Principles.**

There is no question that Dr. Willig's methodology applies well-settled economic principles to the unique circumstances of this case. Motorola does not challenge any of the economic principles that underlie Dr. Willig's analysis.[4] Thus, when the seven-factor test is properly considered for what it is—the application of established economic theory—it more than satisfies the relevant *Daubert* factors. Motorola argues generally that Dr. Willig's opinion is unreliable because his specific seven-factor test supposedly fails to satisfy five of the criteria recognized by the Supreme Court in *Daubert*: (i) testability; (ii) peer review; (iii) known rate of error; (iv) controlling standards; and (v) general acceptance in the scientific community. *See Daubert*, 509 U.S. 593-95. But courts distinguish between an economic expert's tools—the principles or methodology upon which the expert relies—and the conclusions reached using those tools; only the former require scrutiny under *Daubert*. *See Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d 796, 806-08 (7th Cir. 2013); *Smith*, 215 F.3d at 718-19; *see also TC Sys., Inc. v. Town of Colonie*, 213 F. Supp. 2d 171, 183 (N.D.N.Y. 2002). Each of Motorola's arguments fails to show that Dr. Willig's economic analysis should be excluded.

***<u>Developed for Litigation.</u>*** Motorola contends that Dr. Willig's seven-factor test was created for this report and therefore fails to satisfy a number of the *Daubert* factors. Pl's. Mot.

[3] The accuracy of the assumptions underlying an expert's opinion is germane to the weight, rather than the admissibility of the opinion. *See Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765-66 (7th Cir. 2013). Otherwise admissible expert testimony is to be attacked not by excluding the expert, but through cross-examination, presentation of contrary evidence, and explanation of the burden of proof. *See id.* at 766 (quoting *Daubert*, 509 U.S. at 596).

[4] The underlying economic framework for analyzing information sharing among competitors is laid out in Part IV of Dr. Willig's Report. (*See* Ex. A ¶¶ 17-37.)

("Mot.") at 7. In the antitrust context, however, "[t]here is no single established methodology for determining whether the relevant market reflects evidence of anticompetitive behavior." *U.S. Info. Sys., Inc. v. IBEW Local Union No. 3*, 313 F. Supp. 2d 213, 229 (S.D.N.Y. 2004). Accordingly, courts regularly admit expert economist testimony in antitrust cases that identify economic factors that bear on liability, *see e.g.*, *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 660-61 (7th Cir. 2002), including opinions just like Dr. Willig's that are developed specifically for that litigation.[5]

For example, in *Fleischman v. Albany Med. Ctr.*, 728 F. Supp. 2d 130 (N.D.N.Y. 2010), Dr. Willig offered an expert opinion on the effect of particular information exchanges. The district court denied plaintiffs' motion to exclude, observing that Dr. Willig was: (1) looking at evidence and interpreting the likelihood of a conspiracy based on well-accepted economic principles; (2) evaluating facts based on his understanding of those principles; and (3) offering opinions on the likelihood of agreement "informed by his background knowledge in economics and his ability to apply the facts to this information." *Id.* at 166. He offers the same types of opinions here.

Likewise, in *In re Titanium Dioxide Litig.*, No. RBD-10-0318, 2013 WL 1855980 (D. Md. May 1, 2013), defendants in a price-fixing case sought to exclude an economic expert who intended "to opine, after evaluating the discovery record and 'well-established economic considerations,' that the Defendants' conduct was 'inconsistent with competition and could be rationally explained only by collusion.'" *Id.* at *8 (internal citation omitted). They argued that the analysis was unreliable because the expert "based his opinions on his own multi-factor guide,

[5] *See also U.S. Info. Sys., Inc.*, 313 F. Supp. 2d at 240 (permitting economic expert to "point to factors that would tend to show anticompetitive conduct in a market"); *In re Titanium Dioxide Antitrust Litig.*, No. RBD-10-0318, 2013 WL 1855980 at *4 (D. Md. May 1, 2013) (citing *In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348, 1355 (N.D. Ga. 2000)); *In re Urethane Antitrust Litig.*, No. 04–1616–JWL, 2012 WL 6681783, at *3 (D. Kan. Dec. 21, 2012).

which was produced solely for litigation and was not subject to peer review." *Id.* at *10. The court denied the motion, explaining that although the multi-factor guide was developed for litigation and had not been subjected to peer review, it "consists of the standard economic factors that economic experts often consider in antitrust cases." *Id.* at *12. The court concluded that the "multi-factor guide is consistent with those factors that experts in the field have long considered and that courts have long accepted as reliable. This finding mitigates the concern that [the expert's] guide was developed solely for litigation, since the contents of the guide are not fledgling theories of collusion and cartel behavior, but well-accepted, standard principles." *Id.* So too here.

The specific factors in Dr. Willig's test represent the established standards by which economists "look to see relevant evidence of whether the effect of the communication of competitively sensitive information is pro or anticompetitive." (Ex. D 174:17-20.) His test is grounded in recognized economic theory, and he relied on peer-reviewed economic literature to support his theory that an analysis of communications among competitors must distinguish between information exchanges, which are often procompetitive, and price-agreement communications. (Ex. A ¶¶ 17-37.) Dr. Willig's specific test need not be independently supported by peer-reviewed publications given that it is based on sound economics and that he explained the process by which he reached his conclusions. *See, e.g., Lapsley*, 689 F.3d at 810-11; *Srail v. Vill. of Lisle*, 249 F.R.D. 544, 562 (N.D. Ill. 2008).

Motorola erroneously relies on *Reed v. Advocate Health Care*, 268 F.R.D. 573 (N.D. Ill. 2009), to argue that novel theories are unreliable. In *Reed*, the plaintiff's expert's methodology suffered from several fundamental flaws, including that his econometric model relied on averages, and its regression analysis was imprecise. *See id.* at 590-93. The methodology was

roundly criticized, and the court's opinion makes clear that the ***methodology was not supported by relevant economics literature***. *See id.* at 587. By contrast here, Motorola offers no critique of the economic theories that underlie Dr. Willig's seven-factor test.

***Replicability.*** Motorola further contends that Dr. Willig's seven-factor test is not replicable because he did not create a written record of every document he considered but found was not indicative of a conspiracy. Mot. at 8. It cites no legal, economic, or expert authority in support of this "written record" requirement. In any event, Dr. Willig's report and testimony make clear that he began his analysis with the specific documents relied upon by the plaintiffs' experts that purport to relate to Sharp, and documents identified by Motorola in its discovery responses regarding "conspiracy evidence" that purport to relate to Sharp. (Ex. A ¶ 6.) He analyzed those documents using a mechanism similar to what economists at the U.S. antitrust agencies commonly use. (Ex. D 256:17-257:4.) He explained how he used this process to exclude certain documents. (Ex. A ¶¶ 48-49; Ex. D 223-237.) Thus, an expert seeking to replicate Dr. Willig's analysis could readily identify the data set upon which he focused his work and apply the seven-factor test.[6]

***Epson Documents.*** Lastly, Motorola complains that Dr. Willig did not identify, as evidence that is economically consistent with a price-fixing agreement, four documents that defendant Epson Imaging Devices identified in a Fed. R. Civ. P. 30(b)(6) deposition as forming the basis of its limited plea agreement. Mot. at 8. This, however, is merely an attack on Dr. Willig's conclusions, and not his methodology. Dr. Willig did consider these documents—*see* Ex. A, App. 2—and concluded they were not economically consistent with an effective price-fixing agreement. That says nothing about the reliability of his opinion or his methodology.

[6] Additionally, replication is a jury question that goes to weight and not admissibility. *See Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1122-23 (D. Colo. 2006) (dispute about whether expert's methods and results could be fully replicated presents a jury question).

Whether such documents would be considered by an economist to support an effective price-fixing agreement is a very different question from whether they would influence Epson's business decision to enter into a plea agreement. Notably, Motorola's argument ignores that in the same deposition, Epson denied knowledge of any specific price-fixing agreements with Sharp. (*See generally* Ex. E, Epson 30(b)(6) (Seki) Tr. 30:11-41:24, Oct. 28, 2011.)[7]

In any event, Motorola never asked Dr. Willig about these documents during his deposition to learn why he did not believe the economic evidence suggested an effective price-fixing agreement. They remain free to do so at trial.

**B. Dr. Willig Reliably Applied the Seven-Factor Test to the Documents.**

Motorola also criticizes Dr. Willig's application of the first, third, fourth and fifth prongs of the seven-factor test. Mot. at 9-11 (Motorola does not criticize his applications of prongs two, six and seven.). Not only are his applications appropriate, but these criticisms are more properly dealt with through cross-examination—not exclusion. *See Manpower, Inc.*, 732 F.3d at 807-08.

**1. Dr. Willig's first and fifth prongs reliably assessed whether documents were direct communications between competitors.**

The first prong of Dr. Willig's test requires that the "document must contain an unambiguous indication of direct communications between competing TFT-LCD panel suppliers . . . ." (Ex. A ¶ 40.) His fifth prong requires that the "language of the communication and documents must be indicative of a possible agreement to fix prices between the firms engaged in

---

[7] Epson's 30(b)(6) witness testified as follows: "BY MR. STOKES: What agreements were reached to fix the price of TFT-LCDs sold to Motorola for use in mobile phones with Sharp between fall of 2005 and the middle of 2006? THE WITNESS: ***The company is not aware of specific agreements.*** BY MR. STOKES: Is the company aware of an overall agreement, then? THE WITNESS: The company is aware of the fact that price information was exchanged between our company's employees and Sharp during the time period from the fall -- from the fall of 2005 through the middle of 2006. . . . As far as the company goes, it's just that we are -- we have -- we are aware of the fact that there was an exchange of price information with Sharp." (Ex. E 35:15-36:17 (emphasis added).) "Q: . . . At the time that you signed this plea agreement, was the company aware of facts showing that there was one agreement or multiple agreements? . . . THE WITNESS: The facts that we as a company were aware of were that there were several facts indicating an exchange of pricing information with Sharp, ***and there was no direct awareness of a specific agreement, of an agreement***." (*Id.* 38:23-39:9 (emphasis added).)

the communications." (*Id.*) Motorola misstates the record to challenge his application of these prongs, arguing that he failed to account for concealment of the conspiracy and improperly excluded documents without "clear offers and acceptances." Mot. at 9-10.

Dr. Willig, however, did not purport to comment on any absent or concealed evidence. He stated plainly that he started from the "record of documents proffered by the plaintiffs" as evidence of their purported price-fixing case, the "interrogatories, and [plaintiffs'] experts, and the litigation choices of those who were handling the depositions for the plaintiffs." (Ex. D 287:24-288:3.) As reflected on his reliance list, this includes over 800 specific documents, Motorola's interrogatory responses, depositions of Motorola witnesses, and Motorola's Supplemental Attachment A to Certain Defendants' Interrogatory Responses, which Motorola described as "the evidence presently known to Plaintiff regarding Defendants' participation in the conspiracy alleged in the complaint."[8] (Ex. F, Pls.' Supp. Attach. at 1.) And Dr. Willig acknowledged "that it is possible that there are many more communications that were not reflected in the documents I reviewed because they were, for instance, never memorialized in writing. This ultimately does not affect my opinion because my assignment is to review the ***available*** economic evidence . . . ." (Ex. A ¶ 4 n.2 (emphasis added); *see* Ex. D 287:8-16.) He purports to do nothing else.[9]

[8] Motorola argues that Dr. Willig excluded documents that "clearly warrant further investigation" but offers no support for this contention. Mot. at 10. As Dr. Willig testified, he offers no opinion on communications outside the record, and he started with Motorola's own proffer of documents sufficient to prove its case, which is its burden. (Ex. A ¶ 4 n.2; Ex. D 287:8-288:11.)

[9] Motorola cites scant authority for its argument. It relies on *United States v. Rubin*, 999 F.2d 194 (7th Cir. 1993), an inapplicable criminal antitrust case noting that criminal conspiracies are often followed by activities of the co-conspirators to cover their traces. *See id.* at 198. This is irrelevant, as Dr. Willig acknowledges Motorola has alleged concealment of documents and expresses no opinion on what materials "concealed" might show. Motorola also cites *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940 (7th Cir. 1997), where a statistical expert in an age discrimination case was excluded because: (1) the data set arbitrarily excluded two key items of available data for no reason; and (2) the statistician arbitrarily failed to incorporate any factors other than age into his analysis. *Id.* at 942. Dr. Willig's application of prong one suffers from none of these problems.

### 2. Dr. Willig reliably applied the third prong requiring communications by significant suppliers of Motorola products.

The third prong of Dr. Willig's methodology required that the firms "must be communicating information about products supplied to Motorola" and "must also be significant suppliers of the products to Motorola." (Ex. A ¶ 40.) Motorola claims that Dr. Willig "guessed" because he did not know who qualified as a "significant supplier" to Motorola or how he determined who did qualify. Mot. at 10. This is contradicted by the record. Dr. Willig testified that he assessed a supplier's ability to sell to Motorola in a "not insignificant quantity" that would have "market impact, able to affect price or to affect rivals' capacity utilization," (Ex. D 196:13-197:6), that factors included current sales and recent past sales to Motorola, (*id.* 270:18-25), and that this factor was "a matter of antitrust economics, not legal economics, but antitrust economics, that's a pretty common idea of calling a supplier significant or not." (*Id.* 197:22-25.)[10]

Motorola cites a medical negligent design case, *Deimer v. Cincinnati Sub-Zero Prods., Inc.*, 58 F.3d 341 (7th Cir. 1995), to argue that the Court must rule out "subjective belief or unsupported speculation." Mot. at 10. But in *Deimer*, the Seventh Circuit affirmed the exclusion of the expert because he "did not conduct any studies or analysis to substantiate his opinion" and had "no supporting methodology or protocol of any kind to render his opinion reasonable or credible . . . . The witness proffered unverified statements that were unsupported by any scientific method." *Id.* at 344-45 (internal quotations omitted). Here, by contrast, Dr. Willig constructed a systematic methodology based on his expertise in economics, applied that methodology, and developed opinions based on that application.

[10] Motorola also has not identified any documents excluded from Dr. Willig's consideration due to this third prong. (*See* Ex. D 197:18-19, 200:14-15.)

### 3. Dr. Willig reliably applied prong four's requirement that the communication be between individuals working in TFT-LCD supply divisions.

Prong four requires that the "communications must be between individuals working for the TFT-LCD panel supply divisions of their respective firms." (Ex. A ¶ 40.) Dr. Willig explained that this prong is necessary to "make sure if a communication is going to be judged as potentially indicative of a price agreement, that the parties to the communication are people who are genuinely in the business." (Ex. D 202:1-5.)

At his deposition, Dr. Willig did not recall precisely who was in the supply division of the TFT-LCD firms. Mot. at 11. But Motorola is wrong again when it implies that he engaged only in "guesswork": Dr. Willig testified that he reviewed "tons and tons and tons of documents, and the same people tend to show up a lot. And one gets to know who they are by their names anyway, even if I can't remember their names." (Ex. D 202:12-15.) Although he could not recite at his deposition a precise list of individuals in the supply divisions, he testified that someone on his team likely did have such a list, and that if a name showed up on a document that was unfamiliar to Dr. Willig and his team, they investigated whether that person was in a supply division. (*Id.* 202:19-203:7.) When asked about whether specific individuals working for Hitachi and Sharp met this criterion, Dr. Willig recalled that they did. (*Id.* 271:11-15.)[11]

[11] In support, Motorola relies on a case that does not even address Motorola's "guesswork" argument. In *Southwire Co.*, the district court denied a motion to exclude the plaintiffs' economics expert, offered, like Dr. Willig, to evaluate the "connection between the alleged conspiracy and the allegedly inflated prices." 528 F. Supp. 2d at 925-26. The defendants in *Southwire* argued that the expert considered the wrong data in applying his econometric model, but the court held that the issue "was an exercise of professional judgment subject to cross-examination. It is not a ground for excluding his testimony altogether." *Id.* at 928.

### C. Motorola Mischaracterizes Dr. Willig's Methodology and Conclusion About Competition in the TFT-LCD Market.

Motorola raises three arguments against the admissibility of "Dr. Willig's conclusion that suppliers of TFT-LCD panels sold to Motorola engaged in vigorous competition." Mot. at 12. Each is baseless.

First, Motorola argues that Dr. Willig "cherry-picked" evidence and "based his opinion on his review of six select documents." *Id.* at 12-13. This is untrue. Dr. Willig's report explains that his search for " instances of communication that may be indicative of an agreement to fix prices . . . began with the universe of documents that [he] considered in preparing [his] report." (Ex. A ¶ 40.) His team then limited the relevant universe by "looking for documents that either had some report of what could be competitively sensitive information or could have some indication of an example of communication." (Ex. D 113:2-5.) Motorola's argument that he considered only six documents is an apparent reference to the six communications that Dr. Willig highlighted as "***examples*** . . . of communications demonstrating a well-functioning market with strong competitors competing vigorously for business." (Ex. A ¶ 48 (emphasis added).) This was not the entire universe on which Dr. Willig relied.[12]

Second, Motorola mischaracterizes Dr. Willig's report and testimony when it asserts that Dr. Willig went "no further than just reading and relying on the language in the documents" and "fail[ed] to conduct any independent economic analysis to confirm whether the pricing information within the documents actually reflected the pricing in the market." Mot. at 12. To the contrary, Dr. Willig's report explains that a "rigorous economic analysis . . . should include both an analysis of the relevant documents as well as an analysis of the pricing data for the panels in question." (Ex. A ¶ 44.) His testimony reiterates that his analysis is based on the

[12] Dr. Willig "may state an opinion . . . without first testifying to the underlying facts or data." Fed. R. Evid. 705.

context from pricing data, documents reflecting the "process in the marketplace," "competitive indicators surrounding a transaction or marketplace communication," and searches to identify relevant contemporaneous documents. (Ex. D 110:1, 12-18, 117:15-25, 313:3-9.)

Finally, Motorola greatly mischaracterizes Dr. Willig's conclusions when it says he "opined that competition was vigorous during the ***entire*** Plea Period." Mot. at 13 (emphasis in original). Dr. Willig instead opined that there is "an abundance of evidence that Sharp and other suppliers" engaged in vigorous competition, and that any "episodes of agreements to fix prices of TFT-LCD panels sold to Motorola during the plea period . . . were sporadic and limited in duration." (Ex. A ¶ 9.)[13]

**D. Dr. Willig's Opinion Does Not Interfere with the Role of the Jury.**

Motorola also relies on *Fleischman* to argue that "[e]xpert witnesses are only permitted to testify 'to matters within the witness' scientific, technical or specialized knowledge, and not to lay matters which a jury is capable of understanding and deciding without the expert's help." Mot. at 13 (quoting *Fleischman*, 728 F. Supp. 2d at 165). The *Fleischman* court, however, explicitly permitted ***Dr. Willig*** to offer the very type of opinions offered here. *See Fleischman*, 728 F. Supp. 2d at 166.

Plaintiffs in *Fleischman* challenged Dr. Willig's testimony on the ground that he offered "*factual* conclusions based *solely* on [a] lay understanding of *fact* evidence." *Id.* (emphasis in original). The court rejected this argument, holding that "Prof. Willig is not, as Plaintiffs suggest, merely looking at the evidence and determining that he does not think the evidence indicates the existence of a conspiracy. Instead, he is looking at the evidence and interpreting the likelihood of a conspiracy based on certain well accepted economic factors." *Id.* There, Dr.

[13] This case bears no similarity to *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997), where the Court held that the experts did not sufficiently establish that the particular animal and epidemiological studies on which they relied supported their conclusions as to the cause of plaintiff's cancer. *See id.* at 146-47.

Willig opined that "the type of agreement suggested by the Plaintiffs is unlikely based on the economic state of the market and the way in which the information exchanges took place." *Id.* The court found that these opinions were "***informed by his background knowledge in economics and his ability to apply the facts to this information. A juror would not have this expertise or the ability to apply the factual information to Willig's background knowledge.***" *Id.* (emphasis added).

This is precisely what Dr. Willig did here. He used his economic background and expertise and applied well-established economic principles to analyze the "documents relied upon by the plaintiffs' experts that purport to relate to Sharp, and *documents identified by Motorola* in its discovery responses as 'including conspiracy evidence' that purport to relate to Sharp." (Ex. A ¶ 6 (emphasis added).)[14]

Finally, Motorola contends that Dr. Willig's "suggestion that the facts of this case be analyzed under the rule-of-reason is contrary to the law and should be excluded." Mot. at 14. But Dr. Willig offers no opinion on the appropriate legal standard to be applied in this case. To the extent he referenced the rule-of-reason standard, it was in connection with explaining that an economist reviews information exchanges to assess both their pro-competitive and anti-competitive potential:

> I do think that's right, that the appropriate standard to judge the flow of information among competitors is what lawyers would call the rule of reason,

[14] In *Fleischman*, the district court excluded only a small portion of Dr. Willig's testimony that would have touched on the defendants' state of minds, or specifically, "what information Defendants considered and the weight that information played" in setting compensation. *Fleischman*, 728 F. Supp. 2d at 168. Here, Dr. Willig does not propose to testify regarding defendants' intent or state of mind. The other two cases Motorola cites are similarly unhelpful for its position here. In *Jamsports*, the court excluded the testimony of plaintiff's liability expert to the extent he opined on the intent of defendant and others, but permitted testimony on the economic implications of defendant's conduct. *Jamsports & Entm't, LLC v. Paradama Prods., Inc.*, No. 02-cv-2298, 2005 WL 14917, at *10 (N.D. Ill. Jan. 3, 2005). In *City of Tuscaloosa*, the Eleventh Circuit's decision hinged on the fact that the expert's assertions regarding the existence of a conspiracy were outside his competence as a statistician. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 565 (11th Cir. 1998). Neither case supports the exclusion of Dr. Willig's testimony.

> although economists are used to that idea, without whatever its legal definition is in the courts, meaning it's not an automatic indicator that something is going wrong. As a matter of economic policy or economic impact, rather it has to be judged in its context in terms of what it actually accomplishes or doesn't accomplish.

(Ex. D 32:3-33:3; *see also id.* 33:4-34:10, 38:11-39:11, 42:17-44:10, 213:25-214:22.)

Nor do the cases that Motorola cites establish that an economic expert is precluded from opining on competitive effects in an antitrust case merely because the plaintiff characterizes its claims only as *per se* claims. In *Aventis Envtl. Science USA LP v. Scotts Co.*, 383 F. Supp. 2d 488 (S.D.N.Y. 2005), the court limited the testimony of one of the co-defendant's antitrust liability experts in a rule of reason case because the court determined that the expert's analysis would confuse the jury *because he had testified that the underlying business decision was permissible "irrespective" of the decision's effect on competition.* *Id.* at 516 (emphasis added). The court nonetheless held that the expert could testify in a manner that "d[id] not run counter to the established rule of reason analysis or that runs the risk of confusing the jury as to the appropriate legal tests." *Id.*

There is no such concern here. The economic literature and even Motorola's expert agree that information exchanges are not inherently anticompetitive and that further analysis is necessary to determine their effects. (*See* Ex. C 1489:22-1491:21.). Dr. Willig's explanation for this rubric was thus perfectly appropriate.[15]

## CONCLUSION

For the foregoing reasons, Sharp respectfully submits that the Court should deny Motorola's Motion to Exclude the Expert Testimony of Dr. Robert D. Willig in its entirety.

---

[15] Motorola cites to *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328 (7th Cir. 2012) for the proposition that "[u]nder the *per se* framework, a restraint is deemed unreasonable without any inquiry into the market context in which the restraint operates." *Id.* at 336. No matter. A mere communication is not a "restraint" and Motorola cites no case suggesting it is. *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 125 (3d Cir. 1999). In any event, *Agnew*—which concerned a motion to dismiss—had nothing to do with expert testimony.

November 12, 2013

Respectfully submitted,

By: /s/ Kenneth A. Gallo

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Kenneth A. Gallo (*pro hac vice*)
Joseph J. Simons (*pro hac vice*)
Craig A. Benson (*pro hac vice*)
2001 K Street, NW
Washington, DC 20006-1047
Telephone: (202) 223-7300
Facsimile: (202) 223-7420
Email: kgallo@paulweiss.com
jsimons@paulweiss.com
cbenson@paulweiss.com

BUTLER RUBIN SALTARELLI & BOYD LLP
James A. Morsch
Andrew David Shapiro
70 West Madison Street
Suite 1800
Chicago, IL 60602
Telephone: (312) 444-9660
Facsimile: (312) 444-9287
Email: jmorsch@butlerrubin.com
ashapiro@butlerrubin.com

*COUNSEL FOR DEFENDANTS SHARP CORPORATION AND SHARP ELECTRONICS CORPORATION*