**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MOTOROLA MOBILITY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 09 C 6610 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| AU OPTRONICS CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION & ORDER**

The Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA") places all nonimport foreign commerce outside the Sherman Act's reach unless such conduct (1) has a "direct, substantial, and reasonably foreseeable effect" on American domestic or import commerce; and (2) such effect gives rise to a Sherman Act claim. Motorola Mobility, Inc. ("Motorola") alleges that numerous manufacturers of liquid crystal display ("LCD") panels (collectively, "Defendants") conspired to raise prices of LCD panels in violation of the Sherman Act. The MDL court denied Defendants' motion for partial summary judgment with respect to Motorola's Sherman Act claim based on purchases of LCD panels by its foreign affiliates, finding that Motorola had presented admissible evidence from which a jury could find that final decisions regarding pricing of LCD panels took place in the United States. The case was remanded to this court for trial, and Defendants moved for reconsideration of the MDL court's ruling, arguing that there was no domestic effect that gave rise to Motorola's foreign affiliates' Sherman Act claims. For the reasons stated below, Defendants' motion for reconsideration is granted.

## I. BACKGROUND

Motorola is a technology company based in Libertyville, Illinois, that manufactures a number of electronic devices, including mobile phones. These mobile phones contain LCD panels that Defendants sold to Motorola and its foreign affiliates. The complaint alleges that, from 1996-2006, Defendants took part in a global conspiracy to raise the price of LCD panels above the price that would have prevailed in a competitive market.

The purchases of LCD panels at issue in this case fall into three categories: (1) purchases of LCD panels by Motorola that were delivered directly to Motorola facilities in the United States ("Category I"); (2) purchases of LCD panels by Motorola's foreign affiliates that were delivered to the foreign affiliates' manufacturing facilities abroad, where they were incorporated into mobile phones that were later sold in the United States ("Category II"); and (3) purchases of LCD panels by Motorola's foreign affiliates that were delivered to the foreign affiliates' manufacturing facilities abroad and were later incorporated into mobile phones sold outside the United States ("Category III"). Motorola's foreign affiliates have assigned their claims to Motorola.

Whether Motorola can bring claims under the Sherman Act based on the Category II and Category III purchases is the question that is now before this court. That question was addressed three times by the MDL court: first, in its order granting Defendants' motion to dismiss the first amended complaint; second, in its order denying Defendants' motion to dismiss the second amended complaint; and third, in its order denying Defendants' motion for partial summary judgment.

***Motorola I***

Defendants moved to dismiss the first amended complaint on the ground that the FTAIA barred Motorola's claims based on the Category II and Category III purchases by Motorola's foreign affiliates. Defendants argued that Motorola's claims based on these purchases fell under the FTAIA's general rule that the Sherman Act shall not apply to nonimport conduct involving trade with foreign nations and that Defendants' conduct did not fall under the FTAIA's exception for conduct having a direct, substantial, and reasonably foreseeable domestic effect that gives rise to a Sherman Act claim.

The MDL court agreed with Defendants and granted the motion to dismiss. First, the court noted that Motorola had conceded that it could not assert any claims based on the sale of LCD panels to Motorola subsidiaries abroad if the panels never entered the United States (Category III sales). *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 09 C 5840, 2010 WL 2610641, at *3 (N.D. Cal. June 28, 2010) ("*Motorola I*"). The issue in dispute was whether Motorola could seek to recover based on its foreign affiliates' purchases of LCD panels that were delivered to the foreign affiliates' manufacturing facilities abroad, where they were incorporated into mobile phones that were later sold in the United States (Category II purchases). *Id.*

Next, the court rejected Motorola's argument that the products at issue were "imports" that are not subject to the FTAIA. The court held that the dispositive inquiry is whether the conduct of the defendants, not plaintiffs, involves "import trade or commerce." *Id.* at *5 (citing *Turicentro, S.A. v. Am. Airlines Inc.*, 303 F.3d 293, 303 (3d Cir. 2002), *overruled on other grounds by Animal Sci. Prods. Inc. v. China Minmetals Corp.*, 654 F.3d 462, 467-68 (3d Cir. 2011)). The court noted that Motorola had not alleged that the products were brought to the

United States by Defendants, but rather by Motorola affiliates, and so the products at issue were not "imports." *Id.*

Having found that the FTAIA's general rule of non-liability applied to Motorola's Category II claims, the court next turned to whether the claims nevertheless fell under the domestic injury exception. The court focused its analysis on the domestic injury exception's second prong: whether the alleged domestic effect gave rise to the Sherman Act claim. The court noted that, under Ninth Circuit precedent, the "gives rise to" language of the FTAIA requires a plaintiff to establish proximate cause between the alleged anticompetitive effects in the United States and the plaintiff's foreign injury. *Id.* at *6 (citing *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 987-88 (9th Cir. 2008)). In *DRAM*, the plaintiff alleged that the domestic effect of the defendants' anti-competitive behavior—higher DRAM prices in the United States—gave rise to its foreign injury of having to pay higher DRAM prices abroad because the defendants could not have raised prices worldwide and maintained their global price-fixing arrangement without fixing the DRAM prices in the United States. *Id.* at 984. The Ninth Circuit held that such allegations were insufficient to satisfy the second prong of the FTAIA's domestic injury exception because the fact that the conspiracy had effects in the United States and abroad did not show that "the effect in the United States, rather than the overall price-fixing conspiracy itself, proximately caused the effect abroad." *Id.* at 988 (citing *In re Monosodium Glutamate Antitrust Litig.*, 477 F.3d 535, 539-40 (8th Cir. 2007), for the proposition that proximate cause is not met by allegations that "there was a single global price kept in equipoise by the maintenance of super-competitive prices in the U.S. market"). The MDL court found that, as in *DRAM*, Motorola's allegations that Defendants engaged in a "global conspiracy" that impacted "global prices" and that Motorola's foreign affiliates "suffered injury

4

as a result of defendants' antitrust violations" fell "far short of alleging that the domestic effect of defendants' conduct gave rise to Motorola's foreign injuries." *Motorola I*, 2010 WL 2610641, at *7. Accordingly, the court granted Defendants' motion to dismiss Motorola's foreign injury claims, with leave to amend.

***Motorola II***

In its second amended complaint, Motorola added allegations that senior executives of the Defendants instructed subordinates in the United States to communicate with employees of their competitors to exchange pricing and other competitive information to be used in fixing prices for LCD panels sold to U.S. companies. Motorola alleged that Defendants and their co-conspirators used their U.S. affiliates, salespeople, and contacts to enter into supply agreements in Illinois to sell Motorola LCD panels at unlawfully inflated prices. It alleged that procurement teams at Motorola based in the U.S. negotiated the prices, conditions, and quantities that governed all Motorola purchases of LCD panels around the world for inclusion in Motorola devices. It alleged that its U.S. procurement teams negotiated each LCD panel purchase with Defendants through a process that involved developing requests and preliminary specifications in collaboration with U.S. representatives for Defendants and the final negotiation of the terms of purchase for LCD panels. It alleged that the prices set through this domestic negotiation process directly and immediately impacted Motorola's business plans, including its most basic business choices involving the production, pricing, and sales of its own products. After the price for LCD panels was set, Motorola's supply chain organization, which was based in Illinois, used an automatic scheduling process to determine the quantity requirements for it and its subsidiaries. This process was directed by Motorola from the U.S., and the foreign affiliates issued purchase orders at the price and quantity determined by Motorola in the United States.

Defendants again moved to dismiss, arguing that Motorola had failed to cure the flaws that the MDL court had identified when it dismissed the first amended complaint. Defendants argued that Motorola's allegation that Motorola directed from Illinois that purchases be made abroad by its foreign affiliates was insufficient to establish that any domestic effect gave rise to its Sherman Act claim. Defendants relied on a number of cases from courts across the country that found that allegedly super-competitive domestic prices cannot proximately cause plaintiffs' foreign injuries; rather, such injuries are caused by the foreign effects of the price-fixing conspiracy itself. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 785 F. Supp. 2d 835, 841-42 (N.D. Cal. 2011) ("*Motorola II*").

The MDL court distinguished this case, however, noting that Motorola is an American company, that Motorola alleged that the domestic effect was the setting of a global price in the United States for all LCD panel purchases around the world, that the complaint alleged that the terms of purchase were negotiated by Motorola's procurement teams within the United States and applied worldwide, and that Motorola's foreign affiliates were bound by these negotiations. *Id.* The court held:

> These allegations establish a concrete link between defendants' price-setting conduct (the collusion between the defendants to establish an artificially high price for LCD Panels), its domestic effect (the negotiations between Motorola and defendants that resulted in the setting of a global, anticompetitive price for all LCD Panels sold to Motorola) and the foreign injury suffered by Motorola and its affiliates (payment of higher prices abroad).

*Id.* at 843. The court denied the motion to dismiss, noting that, ultimately, Motorola would still need to prove that global prices were negotiated and set by Motorola's procurement team in Illinois and that a single global price was effective worldwide. *Id.* at 844.

***Motorola III***

The summary judgment briefing focused on whether Motorola could satisfy the standard set by the court in *Motorola II*—whether it could prove that its foreign affiliates in fact paid prices for LCDs pursuant to contracts that were negotiated and entered into in the U.S. Defendants noted that discovery had revealed that over 99% of the LCD purchases at issue were purchases by Motorola's foreign affiliates who assigned their claims to Motorola. They argued that the record demonstrated that prices were not negotiated in Illinois, as Motorola had alleged, but abroad. And they argued that, contrary to Motorola's allegations, Motorola's foreign affiliates did not pay inflated prices for LCDs pursuant to supply agreements entered into in Illinois, but rather entered into agreements outside the U.S.

Applying the standard it set out in *Motorola II*, the MDL court denied Defendants' motion for summary judgment. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827, 2012 WL 3276932, at *2 (N.D. Cal. Aug. 9, 2012) ("*Motorola III*"). The court based its decision on Motorola's "domestic roots," "the locale of the transactions at issue," and the fact that Defendants (i) "targeted Motorola in the United States"; (ii) "knew that Motorola sold mobile devices in the United States and that the United States was one of the largest markets for mobile devices in the world"; (iii) "established U.S. subsidiaries to facilitate sales of LCD panels to Motorola in the United States"; (iv) "met with Motorola on several occasions in the United States to discuss, and, at times, negotiate prices for LCD panels"; (v) "used their employees— both U.S.-based and those stationed abroad—in furtherance of the price-fixing conspiracy"; and (vi) pled guilty to participating in a conspiracy to fix prices of LCD panels sold in the United States. *Id.* at *2-3.

In response to Defendants' argument that Motorola had not identified any effect on U.S. domestic commerce that gave rise to Motorola's Sherman Act claim, the court held:

> Motorola has presented admissible evidence from which a jury could infer that final decisions regarding pricing of LCD panels took place in the United States. Motorola also points to the deposition testimony of its employees to support its claim that foreign affiliates issued purchase orders at the price and quantity determined by Motorola in the United States.

*Id.* at *3 (citations omitted). The case was then remanded to this court for trial, where Defendants filed a motion for reconsideration of the MDL court's order denying summary judgment.

## II. STANDARD OF REVIEW

Defendants move for reconsideration under Federal Rule of Civil Procedure 54(b), which provides that an order "that adjudicates fewer than all the claims or rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." The Seventh Circuit has not addressed how transferor courts should review the pretrial determinations of transferee MDL courts.[1] The Fifth Circuit has held that transferor courts should use the law of the case doctrine to determine whether to revisit an MDL court's decision. *In re Ford Motor Co.,* 591 F.3d 406, 411 (5th Cir. 2009). Under that doctrine, "a successor judge has the same discretion to reconsider an order as would the first judge, but should not overrule the earlier judge's order or judgment merely because the later judge might have decided matters differently." *Id.* The doctrine allows successor courts to "correct serious errors of the transferee court." *Id.*

---

[1] A transferor court refers to the court in which the suit was begun (here, the Northern District of Illinois); the transferee court refers to the court to which the case was transferred for MDL pretrial rulings (the Northern District of California).

One recent decision criticized the Fifth Circuit's holding, however. *See Hill v. Ford Motor Co.*, No. 11 C 799, 2013 WL 5360015, at *6 (N.D. Ga. Sept. 25, 2013). The *Hill* court noted that almost every case invoking the law of the case doctrine involved an earlier *appellate* decision, not an earlier decision of the district court. *Id.* The court suggested that the law of the case doctrine should not apply to review of MDL court pretrial rulings, because "a district judge [can] always reverse a prior ruling that she had made in the same case if she later decided she had been wrong . . . . On appeal, the appellate court is only going to care whether the ultimate ruling was right, not whether the judge's first call on the issue was arguably meritorious." *Id.* Ultimately, however, the court noted that it did not matter whether the transferor court applied the law of the case doctrine, because the standard in considering a motion for reconsideration is the same as the law of the case doctrine standard. *Id.* Under both standards, a court may correct clear errors of law. *See Zurich Capital Mkts. Inc. v. Coglianese*, 383 F. Supp. 2d 1041, 1045 (N.D. Ill. 2005) ("[U]nder Rule 54(b), a court may correct clear errors of fact or law in an interlocutory order.")

Accordingly, this court will also apply the "clear error" standard of review to the MDL court's denial of summary judgment, while being mindful of the fact that "[i]t would vitiate most of the purposes of consolidating litigation if, after remand, parties could simply re-visit the transferee court's pre-trial rulings . . . ." *Winkler v. Eli Lilly & Co.*, 101 F.3d 1196, 1202 n.5 (7th Cir. 1996).

The court is reviewing the MDL court's denial of summary judgment. Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009). "[A] factual despite is 'genuine' only if a reasonable

jury could find for either party." *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565

F.3d 365, 368 (7th Cir. 2009). The court ruling on the motion construes all facts and makes all

reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is warranted when the nonmoving

party cannot establish an element of its case on which it will bear the burden of proof at trial.

*Kidwell v. Eisenhauer*, 697 F.3d 957, 964 (7th Cir. 2012).

## III. ANALYSIS

### A. Whether Motorola Can Satisfy the Domestic Injury Exception

#### 1. The FTAIA and *Empagran I*

Motorola brings claims under Section 1 of the Sherman Act, 15 U.S.C. § 1. In 1982,

Congress amended the Sherman Act by passing the FTAIA. "The FTAIA seeks to make clear to

American exporters (and to firms doing business abroad) that the Sherman Act does not prevent

them from entering into business arrangements . . . , however anticompetitive, as long as those

arrangements adversely affect only foreign markets." *F. Hoffmann-La Roche Ltd. v. Empagran

S.A.*, 542 U.S. 155, 161 (2004) ("*Empagran I*"). Section 6(a) of the FTAIA reads as follows:

> Sections 1 to 7 of this title [*i.e.*, the Sherman Act] shall not apply to conduct
> involving trade or commerce (other than import trade or import commerce) with
> foreign nations unless—
>> (1) such conduct has a direct, substantial, and reasonably foreseeable
>> effect—
>>> (A) on trade or commerce which is not trade or commerce with
>>> foreign nations; or
>>> (B) on export trade or export commerce with foreign nations, of a
>>> person engaged in such trade or commerce in the United States;
>>> and
>> (2) such effect gives rise to a claim under the provisions of sections 1 to 7
>> of this title, other than this section.
> If sections 1 to 7 of this title apply to such conduct because of the
> operation of paragraph (1)(B), then sections 1 to 7 title of this title shall

apply to such conduct only for injury to export business in the United States.

15 U.S.C. §6a.

In *Empagran I*, the Supreme Court explained that the FTAIA "lays down a general rule placing all (nonimport) activity involving foreign commerce outside the Sherman Act's reach." 542 U.S. at 162. "It then brings such conduct back within the Sherman Act's reach provided that the conduct *both* (1) sufficiently affects American commerce, *i.e.*, it has a 'direct, substantial, and reasonably foreseeable effect' on American domestic, import or (certain) export commerce, *and* (2) has an effect of a kind that antitrust law considers harmful, *i.e.*, the 'effect' must 'giv[e] rise to a Sherman Act claim.'" *Id.* (quoting 15 U.S.C. §§6a(1), (2)).

In *Empagran I*, the plaintiffs were a group of foreign and domestic purchasers of vitamins who alleged that vitamin manufacturers and distributors had engaged in a price-fixing conspiracy, raising the price of vitamin products to customers in the United States and to customers in foreign countries. 542 U.S. at 159. The Court focused on the "anticompetitive price-fixing activity that [was] in significant part foreign, that cause[d] some domestic antitrust injury, and that independently cause[d] separate foreign injury." *Id.* at 158. The Court held that the domestic injury exception does not apply where the plaintiff's claim rests solely on the independent foreign injury. *Id.* at 159. The Court arrived at this conclusion for two main reasons.

First, the Court noted that it ordinarily construes ambiguous statutes to avoid unreasonable interference with the sovereign authority of other nations. *Id.* at 164. This rule of statutory construction helps the potentially conflicting laws of different nations work together in harmony—"a harmony particularly needed in today's highly interdependent commercial world." *Id.* at 164-65. The Court noted that application of American antitrust laws to foreign

11

anticompetitive conduct is reasonable insofar as those laws reflect a legislative effort to redress *domestic* antitrust injury that foreign anticompetitive conduct has caused. *Id.* at 165. But it questioned why it would be reasonable to apply America's antitrust laws to foreign conduct insofar as that conduct causes independent foreign harm and that foreign harm alone gives rise to the plaintiff's claim, as "application of those laws creates a serious risk of interference with a foreign nation's ability independently to regulate its own commercial affairs." *Id.* ("Why should American law supplant, for example, Canada's or Great Britain's or Japan's own determination about how best to protect Canadian or British or Japanese customers from anticompetitive conduct engaged in significant part by Canadian or British or Japanese or other foreign companies?").

Second, it found that the FTAIA's language and history suggested that Congress designed the FTAIA to "clarify, perhaps to limit, but not to *expand* in any significant way, the Sherman Act's scope as applied to foreign commerce." *Id.* at 169. And the Court noted that it saw no significant indication that at the time Congress wrote the FTAIA, courts would have thought the Sherman Act applicable where the plaintiff's claim rests solely on independent foreign injury. Accordingly, the Court held that the domestic injury exception does not apply where the plaintiff's claim rests solely on the independent foreign injury. The Court remanded the case to the D.C. Circuit to consider the plaintiff's alternative argument that its foreign injury was not in fact independent of any adverse domestic effect.

### 2. *Empagran II, DRAM,* and the Proximate Causation Requirement

On remand in *Empagran II*, the D.C. Circuit first held that, in determining whether domestic effects "give rise to" a Sherman Act claim, courts should look to see whether there is "a direct causal relationship, that is, proximate causation." *Empagran S.A. v. F. Hoffmann-*

12

*LaRoche, Ltd.*, 417 F.3d 1267, 1271 (D.C. Cir. 2005) ("*Empagran II*"). The court found that this interpretation of the FTAIA accords with the principle of prescriptive comity that sovereign nations should respect each other by limiting the reach of their laws. *Id.* Applying the proximate cause standard, the court considered the plaintiffs' allegations that the defendants were able to sustain super-competitive prices abroad only by maintaining super-competitive prices in the United States as well. *Id.* The court found these allegations to be insufficient because they established at most but-for causation, not proximate causation, reasoning:

> Under the appellants' theory, it was the foreign effects of price-fixing outside of the United States that directly caused, or "g[a]ve rise to," their losses when they purchased vitamins abroad at super-competitive prices. That the appellees knew or could foresee the effect of their allegedly anti-competitive activities in the United States on the plaintiffs' injuries abroad or had as a purpose to manipulate United States trade does not establish that "U.S. effects" proximately caused the appellants' harm. . . . It was the foreign effects of price-fixing outside of the United States that directly caused or "g[a]ve rise to" the appellants' losses when they purchased vitamins abroad at super-competitive prices.

*Id.*

In *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, 546 F.3d 981, 986 (9th Cir. 2008), the Ninth Circuit also adopted the proximate cause standard. The court considered the plaintiff's allegations that the defendants' global conspiracy to fix DRAM prices had a domestic effect (higher DRAM prices in the United States) which gave rise to its foreign injury of having to pay higher DRAM prices abroad because the defendants could not have raised prices worldwide and maintained their global price-fixing arrangement without fixing the DRAM prices in the United States. *Id.* at 988. The court found that the plaintiff had not shown that the higher U.S. prices proximately caused its foreign injury of having to pay higher prices abroad because "[o]ther actors or forces may have affected foreign prices." *Id.* "In particular, that the conspiracy had effects in the United States and abroad does not show that the effect in the United States, rather than the overall price-fixing conspiracy itself, proximately caused the

effect abroad." *Id.* at 988-89 (citing *In re Monosodium Glutamate*, 477 F.3d 535, 539-40 (8th Cir. 2007) ("The domestic effects of the price fixing scheme (increased U.S. prices) were not the direct cause of the appellants' injuries. Rather, it was the foreign effects of the price fixing scheme (increased prices abroad).")).[2]

### 3. The MDL Court's Analysis of the "Gives Rise To" Prong

Against this backdrop, the court now turns to the MDL court's analysis of whether any domestic effect gave rise to Motorola's Sherman Act claim based on its foreign affiliates' purchases. The MDL court found that the "gives rise to" prong was satisfied because:

> Motorola has presented admissible evidence from which a jury could infer that final decisions regarding pricing of LCD panels took place in the United States. . . . Motorola also points to the deposition testimony of its employees to support its claim that foreign affiliates issued purchase orders at the price and quantity determined by Motorola in the United States.

*Motorola III*, 2012 WL 3276932, at *3. Defendants argue that this conclusion was a clear error of law because it conflates the concepts of domestic conduct and domestic effect. The court is

---

[2]    The Ninth Circuit did not articulate what constitutes "proximate cause" in the FTAIA context. Judge Noonan wrote a concurring opinion in which he noted that, in the law of negligence, what turns a but-for cause into a proximate cause is "a value judgment that the cause in fact creates an unacceptable risk of injury to a protected interest." *DRAM*, 546 F.3d at 991 (Noonan, J., concurring). He noted that, under that standard, "it would seem that reasonably prudent persons in the position of the defendants would see that their actions setting prices in the United States would negatively affect customers in the United States and elsewhere." *Id.* Nevertheless, Judge Noonan concurred in the judgment, reasoning:

> [I]t has been the judgment of Congress and the Supreme Court that the economic interests of consumers outside the United States are normally not something that American law is intended to protect. Hence it is difficult to persuade a court that injury to foreign consumers has been "caused" by price-fixing in the United States. . . . We reach this vanishing point not from guidance in words like "proximate" or "direct" but from a strong sense that the protection of consumers in another country is normally the business of that country. Location, not logic, keeps [the plaintiff's] claim out of court.

*Id.*

not persuaded by this argument, however, because the setting of prices in the United States is both domestic "conduct" and a domestic "effect."

The more fundamental problem with the MDL court's analysis is that it did not address how the domestic conduct that Motorola argues it can prove constituted a domestic effect that gives rise to a Sherman Act claim. Although this was the only issue raised by Defendants in their motion for reconsideration, Motorola has offered no authority to support the MDL court's conclusion that because the jury could infer that final decisions regarding pricing of LCD panels took place in the United States, Motorola could prove that this domestic effect gave rise to its Sherman Act claim.

To be sure, courts have not clearly articulated what "proximate cause" means in the FTAIA context. But courts have been clear on what it does *not* mean. The three circuits that have considered this question have all agreed that the fact that defendants "knew or could foresee the effect of their allegedly anti-competitive activities in the United States on the [plainitffs'] injuries abroad or had as a purpose to manipulate United States trade does not establish that 'U.S. effects' proximately caused the [plaintiffs'] harm." *Empagran II*, 417 F.3d at 1271; *In re Monosodium Glutamate*, 477 F.3d at 539-40 ("The domestic effects of the price fixing scheme (increased U.S. prices) were not the direct cause of the appellants' injuries. Rather, it was the foreign effects of the price fixing scheme (increased prices abroad)."); *DRAM*, 546 F.3d at 988 ("[T]hat the conspiracy had effects in the United States and abroad does not show that the effect in the United States, rather than the overall price-fixing conspiracy itself, proximately caused the effect abroad.").

Decisions from district courts are also uniform. *See In re Hydrogen Peroxide Antitrust Litig.*, 702 F. Supp. 2d 548, 553 (E.D. Pa. 2010) (holding that domestic injury exception did not

apply where plaintiffs' "global procurement programs . . . involved the setting at one time of a single global price"); *Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 608 F. Supp. 2d 1166, 1186 (N.D. Cal. Mar. 31, 2009) ("Both this court and the Ninth Circuit have held that, to the extent that plaintiff's proximate causation theory rests on proof of a global procurement strategy, this is not a viable legal theory."); *In re Rubber Chems. Antitrust Litig.*, 504 F. Supp. 2d 777, 786 (N.D. Cal. 2007) (holding that domestic injury exception did not apply where plaintiffs alleged that defendants "conspired to bring about a 'single worldwide price increase'").

The MDL court believed that this case was distinguishable because of (i) Motorola's domestic roots; (ii) the locale of the transactions at issue;[3] (iii) the fact that Defendants targeted Motorola in the United States; and (iv) Defendants' anti-competitive conduct in the United States. But the MDL court did not explain *why* these facts mattered to the proximate cause analysis, insofar as the inflated prices were paid by Motorola's foreign affiliates. The court agrees with Defendants that, under a straightforward reading of *Empagran II* and *DRAM*, none of these facts establish that a domestic effect gave rise to Motorola's Sherman Act claim.

First, the fact that Motorola is a domestic company is irrelevant to whether any domestic effect gave rise to Motorola's Sherman Act claim. That claim belongs to the Motorola foreign affiliates who purchased LCD panels at inflated prices from Defendants. That the foreign affiliates have assigned their claims to a parent company that happens to be a U.S. corporation makes it no more likely that it was a domestic effect, rather than the overall price-fixing conspiracy itself, that proximately (*i.e.*, directly) caused Motorola's foreign affiliates to purchase LCD panels from Defendants at inflated prices. *See Sun*, 608 F. Supp. 2d at 1189 ("Without a valid theory to show that it stands in the shoes of its subsidiaries for purposes of those DRAM

---

[3] The MDL court did not elaborate on *what* about the locale of these transactions was significant. The record facts are described *infra* p. 17.

purchases, the purchases themselves must be viewed as foreign transactions made by independent subsidiary entities, albeit pursuant to a global pricing strategy instituted by its parent corporation . . . .").

This court also fails to see how the "locale of the transactions at issue" helps Motorola, as the undisputed facts show that the transactions were overwhelmingly foreign in nature.[4]   The MDL court identified one aspect of these transactions that took place domestically: Motorola's senior procurement officers in the United States approved the prices that Motorola's foreign affiliates were to pay for LCD panels.  *Motorola III*, 2012 WL 3276932, at *3.  But this domestic approval cannot fairly be said to give rise to Motorola's Sherman Act claim.  For Sherman Act purposes, the injury arose when Motorola's foreign affiliates purchased LCD panels at inflated prices, not when Motorola decided at what price those purchases would be made.  *See DRAM*, 546 F.3d at 988 (stating that the foreign injury is "having to pay higher prices abroad"); *In re Monosodium Glutamate*, 477 F.3d at 539 n.3 (stating that the injury is the "higher prices paid").  Motorola's domestic approval was not the direct cause of Motorola's foreign affiliates' claim; rather, that claim resulted from the overall price-fixing conspiracy itself.  *See DRAM*, 546 F.3d at 988.

---

[4]    *See* Defendants' Joint Motion for Summary Judgment 8-9, *Motorola III* ("The Foreign Assignors, not Motorola, Inc., purchased LCDs by issuing Purchase Orders to Defendants.  The Foreign Assignors, not Motorola, Inc., paid for the LCDs they purchased from Defendants.  The Foreign Assignors, not Motorola, Inc., manufactured handsets for global markets. . . . Every Foreign Assignor Purchase Order that Plaintiff identified in discovery was issued outside the U.S.  Every Foreign Assignor Purchase Order that Plaintiff identified in discovery that identifies a shipping address called for shipment to occur outside the U.S.  Every Foreign Assignor Purchase Order that Plaintiff identified in discovery called for billing outside the U.S.  Every Foreign Assignor Purchase Order that Plaintiff identified in discovery that includes Terms & Conditions contained a provision requiring compliance with foreign law." (footnotes and citations omitted)).

Even were Motorola's domestic approval of the prices that its foreign affiliates paid an effect that gave rise to its Sherman Act claims, the court also finds that it is not a "substantial" effect on American domestic or import commerce. Thus, Motorola's claim fails the first prong of the domestic injury exception as well. An increase in domestic prices, or a reduction in domestic supply, can constitute a substantial domestic effect that gives rise to a Sherman Act claim. *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 859 (7th Cir. 2012) (finding that the increase in domestic prices in potash constituted a domestic effect that gave rise to a Sherman Act claim). But the fact "[t]hat certain activities might have taken place in the United States is irrelevant if the economic consequences are not felt in the United States economy." *Turicentro*, 303 F.3d at 305. This rule helps prevent the perverse result of a country with no interest in an anticompetitive conspiracy applying its own antitrust laws. It is also supported by the principles of prescriptive comity articulated in *Empagran I* and *DRAM*. Because the economic consequences of Motorola's domestic approval of LCD prices were not felt in the U.S. economy, the domestic approval cannot constitute a domestic effect that gives rise to a Sherman Act claim.

That Defendants targeted Motorola in the United States is also irrelevant to the proximate cause analysis, *Empagran II*, 417 F.3d at 1271 ("That the appellees . . . had as a purpose to manipulate United States trade does not establish that 'U.S. effects' proximately caused the appellants' harm."), as is Defendants' anti-competitive conduct in the United States, *In re Rubber Chemicals*, 504 F. Supp. 2d at 784-85 ("[I]t must be the *domestic effects* of the Defendants' anticompetitive conduct, rather than the anticompetitive conduct itself, which gives rise to [a Sherman Act claim].").

There was therefore no sound basis to find this case distinguishable from *Empagran II* and *DRAM*. As in those cases, it was the overall price-fixing conspiracy itself that proximately caused Motorola's foreign affiliates to purchase LCD panels from Defendants at inflated prices.

## B. Whether the FTAIA's Import Exclusion Applies

Motorola argues that, if this court finds (as it has) that the domestic injury exception does not apply to Motorola's foreign injury claims, then the court should also revisit the MDL court's holding that the FTAIA's general rule applies to Motorola's claims. Sherman Act claims based on "imports" are not barred by the FTAIA. *See* 15 U.S.C. §6a. Motorola argues that injuries arising from Defendants' sales of price-fixed LCD panels to Motorola manufacturing facilities abroad that Defendants knew would be incorporated into Motorola devices sold in the United States fall under the import exclusion of the FTAIA.

The MDL court found that because Motorola had alleged that the foreign-purchased products were imported into the United States by Motorola affiliates, as opposed to Defendants, the foreign-purchased products were not "imports" within the meaning of the FTAIA. This holding is supported by precedent that the dispositive inquiry used to determine whether a product is an "import" is "whether the conduct of the defendants, not plaintiffs, involves 'import trade or commerce.'" *Turicentro*, 303 F.3d at 303. The *Turicentro* court explained that because the defendants did not directly bring their product into the United States, they cannot be labeled "importers" and did not engage in "import trade or commerce." *Id.* Following *Turicentro*, the MDL court noted that Motorola had not alleged that the foreign-purchased products were brought to the United States by Defendants, but rather by Motorola affiliates, and so the products at issue were not "imports." *Id.* The MDL court rejected Motorola's argument that the products were "imports" because Defendants intended for the foreign-purchased LCD panels and products

to be brought to the United States, reasoning that a definition that depends on intent would be difficult to apply. Because this holding was clearly supported by precedent, the court sees no reason to reconsider it.

## IV. CONCLUSION

The FTAIA applies to Motorola's foreign injury claims because they are based on nonimport conduct involving trade with foreign nations. These claims do not fall under the FTAIA's domestic injury exception because they do not arise from any domestic effect. Accordingly, Defendants' motion for reconsideration is granted, and Motorola's claims based on overseas purchases by its foreign affiliates (the Category II and III claims) are dismissed. Parties are to appear for a status hearing on January 31, 2014, at 9:30 a.m. All pre-trial deadlines are stricken for the time being.


ENTER:


_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge


DATED:   January 23, 2014